IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Custody of | ) | No. 32431-1-III |
| | ) | |
| Z.C., | ) | |
| | ) | |
| A Minor Child. | ) | |
| | ) | |
| RICHARD AND DALEENA VAUGHN, | ) | PUBLISHED OPINION |
| | ) | |
| Respondents, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MELISSA ENGLAND, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Melissa England appeals the denial of her motion to modify the nonparental custody decree under which her son, Z.C., resides primarily with his aunt and uncle, Daleena and Richard Vaughn. As was the case with the mother in *In re Custody of T.L.*, 165 Wn. App. 268, 268 P.3d 963 (2011), Ms. England initially resisted her family members' nonparental custody proceeding but ultimately agreed to the findings on the basis of which custody was awarded to the Vaughns—findings that, along with other contemporaneous evidence, lend some support to her claim that she anticipated a

temporary custody arrangement while she dealt with her drug abuse.

More importantly, the findings and conclusions entered in support of the decree are constitutionally insufficient to deprive Ms. England of her parental rights because neither declares her an unfit parent or finds actual detriment to the child. Accordingly, under *T.L.*, she was entitled, in moving to modify the consent decree, to be presumed a fit parent and for the Vaughns to bear a nonparent's burden of proving her current unfitness or that her custody of Z.C. would result in an actual detriment to his growth and development. The trial court erred in failing to consider her motion on that basis.

Exercising our discretion under RAP 18.8, we address the issue, reverse the trial court's orders denying Ms. England's motions to modify, and remand for a new hearing.

## FACTS AND PROCEDURAL BACKGROUND

In August 2006, Richard and Daleena Vaughn filed a nonparental custody petition in Asotin County, seeking custody of their 10-month-old nephew, Z.C. They alleged that their request for custody was in the best interest of Z.C. because his mother, Melissa England (Daleena's sister) was "suspected of doing drugs," "leaves the child with the Petitioners every weekend," "leaves the child with her friends during the week," was "lacking the ability to perform the needed nurturing of the child," and "her home is filthy." Clerk's Papers (CP) at 4. The superior court granted the Vaughns' motion for

2

temporary custody, which was based on affidavits from Ms. Vaughn and Jamie Tedrick, Ms. England's and Ms. Vaughn's mother.

Ms. England responded to the petition within two weeks, denying allegations of current drug use and all allegations of poor parenting, as she would continue to do up until the settlement that led to the decree being challenged on appeal. She also filed an affidavit to which she attached Z.C.'s medical records, asserting that "[h]e has had all his immunizations," had "made all his well baby checks," and "the reports indicate he is thriving." CP at 276-77; 291-314.

Richard Laws was appointed guardian ad litem for Z.C. in August. He filed his report on October 24 in which he concluded, "I do not believe Ms. England is an unfit parent, and I do not believe that placement with her will result in actual detriment to Z.C.'s growth and development." CP at 628.

Among information that Mr. Laws reviewed before making his report were allegations of Ms. England's drug use, including the results of hair tests of Ms. England and Z.C. that were evidently conducted, in accordance with a court order or otherwise, shortly after the nonparental custody petition was filed. No test results are in our record and the information about them is limited and puzzling. Both the Vaughns' amended petition and a declaration of Ms. Tedrick assert that Z.C. had ".24 MG" or "over .24 Mg"

3

of methamphetamine in his system in the test conducted in August 2006. CP at 319, 325. Yet the prevailing cutoff concentration for hair at relevant times was measured in picograms/milligrams, with 500 pg/mg being the cutoff for a "positive" finding.[1] Mr. Laws' guardian ad litem report states that Ms. England's level was only "3.84 ng/mg." CP at 637. In any event, while Mr. Laws "[did] not take [Ms. England's] drug use lightly by any means," he reported that "[n]o one with whom I have spoken, aside from the Petitioners and Ms. England's mother, gives credence to the idea that Ms. England is an addict." CP at 633. He characterized Ms. England as having been candid about occasional drug use but said she insisted that Z.C. had never been with her on such occasions, which Mr. Laws reported and documented was "corroborated by other accounts." CP at 637. For reasons explained in his report, he concluded that the "most likely root cause" of the very low presence of methamphetamine in Z.C.'s hair sample was, if not a "false positive," the result of "accidental environmental exposure" from being in the home or the presence of one of Ms. England's methamphetamine-using

---

[1] 500 pg/mg is the cutoff level reflected in all five hair test reports in the record on appeal. *See* CP at 354, 597 (Ms. England's "positive" results from hair collected in January 2008), and 443, 442 and 143 (Ms. England's "negative" results from hair collected in 2009, 2010, and 2013). 500 pg/mg was the cutoff level included in regulations proposed by the Substance Abuse and Mental Health Services Administration of the Department of Health and Human Resources in 2004. *Proposed Revisions to Mandatory Guidelines for Federal Workplace Drug Testing Programs*, 69 FR 19673,

4

friends. CP at 637-38.

Ms. England was also evaluated by a chemical dependency evaluator and counselor in late September 2006, who told Mr. Laws that "'[i]f I had to put a label on her, I'd call her an abuser, probably not an addict,'" and expressed the opinion that Ms. England's drug use was "a (likely unconscious) method of self-medicating the depression and grief issues for which she has never been treated." CP at 30. BaDi Cannon, Z.C.'s father, with whom Ms. England had been in a relationship for over three years, died of leukemia on March 13, 2005, the same day that Ms. England learned she was pregnant with Z.C. According to Ms. England, although she moved back to the Clarkston/Lewiston Valley to be close to family after Z.C. was born, she was "unable to shake [her] depression and grief," and when she was encouraged to socialize and be more active, she "[u]nfortunately . . . fell back into [an] old party crowd [she] had grown up with . . . and started using drugs again." CP at 123.

Mr. Laws reported that on his home visit, Ms. England's apartment was "clean and posed no apparent health risks to a toddler." CP at 631. He reported "see[ing] no evidence that Ms. England has abandoned her child or left him with an inappropriate caregiver" and "nothing to contradict Ms. England's claims that Ms. Vaughn cared for the

19681 (April 13, 2004).

child because she frequently asked to do so or that Ms. England acquiesced." CP at 640. While he recommended that Ms. England complete a drug treatment program and get evaluation and treatment for depression and grief, he also recommended that Z.C. be returned immediately to Ms. England's care.

At a hearing on December 20, 2006, the trial court evidently expressed a desire to have the Department of Social and Health Services (Department) get involved so that services could be provided to Ms. England. Its intention was reduced to writing in a January 16, 2007 order that granted temporary residential custody to the Vaughns, visitation to Ms. England four days a week, and provided, finally:

> This matter is converted to a Dependency and after the State has carefully reviewed the matter, visitation shall occur as determined by the State with services provided to the mother.

CP at 39.

Ms. England contacted the Department in December 2006 to pursue the service option and met with a Department employee on January 12, 2007, but it is undisputed that notwithstanding the court's order, the Department never commenced a dependency. Department notes from the January 12 meeting indicate that Ms. England "appeared confused about the role of the Department, stating that she was of the understanding that the Department would place her child in care and that she would get her child back sooner

6

this way." CP at 698. According to the notes, the assigned worker explained to Ms. England that the Department "[did] not have [child abuse/neglect] allegations on the family and would not be getting involved." *Id.* While Department records indicate that its assigned worker pointed Ms. England to resources she could pursue on her own, she wrote a confirmatory letter to Ms. England on January 23, 2007, stating, "As I explained, our department does not get involved in custody matters and we were not informed of any child abuse or neglect issues arising from this case." CP at 701. She indicated, "[d]ue to our limitations in this case," she would close Ms. England's case on February 7. *Id.*

According to the Department's records, Ms. England visited its offices again on May 31, 2007. Intake notes indicate that she explained that at a court hearing on May 24, Asotin County District Court Judge Ray Lutes had "asked that she contact [the Department] seeking Family Preservation Services." CP at 686. The notes indicate that the intake employee learned that a mediation had taken place on May 24. Yet the last Department record on this contact and on Ms. England is dated June 5, 2007, indicating that a worker "will followup." CP at 700. The Department's records provided to the superior court in April 2008 (discussed below) reveal no follow-up.

Lacking service support from the Department, Ms. England moved forward on her own. The parties agree that the Vaughns' request for nonparental custody continued to be

7

contested by Ms. England for almost all of the next year, and that Ms. England repeatedly sought increased visitation. We focus on events leading up to trial dates and entry of the agreed orders because of the Vaughns' contention that the custody decree challenged by Ms. England was the result of a contested proceeding.

*Circumstances of the agreed orders*

What Asotin County characterized as "trial" of the custody petition appears to have been scheduled for December 18, 2007. CP at 589-90. RCW 26.10.140 requires a hearing at which the court determines questions of law and fact. When a petition is contested, given the stakes involved, a several-day trial could be expected.

On December 12, 2007, the Vaughns filed a motion to require Ms. England to submit to another drug test of her hair. Ms. England responded with an opposing affidavit, expressing frustration that the trial date for which both sides had agreed they could be ready would be lost. She also stated she was participating in treatment and that drug testing was part of her treatment plan. She attached letters from her treatment counselor indicating she had appeared for a treatment evaluation on March 6, 2007, was wait-listed and began an intensive outpatient group on July 31, 2007, but was transferred to individual counseling because of a conflict with another client. Although she had cancelled two appointments with her counselor, she was scheduled to resume intensive

outpatient treatment on December 3, 2007. The counselor's letter also stated that a UA[2] administered at Ms. England's last visit on November 30 tested clean for methamphetamine, cocaine, marijuana and opiates. Ms. England also provided the court with a letter documenting her employment since May 2007 with a local motel whose manager praised her work performance.

On December 17, the trial court continued the trial to February 13, 2008, indicating that it would be a two-day trial. The following day, it entered an order that granted Ms. England's request for increased visitation with Z.C., but also granted the Vaughns' request that Ms. England be ordered to submit to a drug test of her hair. The order provided that the test would take place at a facility to be selected by the Vaughns, and required that Ms. England "make all efforts to have this test done by January 3, 2008." CP at 49-50.

On January 8, the Vaughns brought a contempt motion asserting that Ms. England had not yet submitted to the hair test that "was suppose[d] to be administered no later than January 3, 2008." CP at 342. On January 10, Ms. England provided the lab with a hair sample. It tested positive for methamphetamine. As a lab director would later testify by affidavit, the levels determined "are not high" but indicated either (1) one use of a high

---

[2] Urinalysis.

9

dosage in approximately the last 90 days, (2) use in smaller doses on multiple occasions over the same timeframe, or (3) prior daily use followed by abstinence over the last four to five months. CP at 356.

In response to the positive drug test, the Vaughns obtained an ex parte order to show cause why Ms. England's visitation with Z.C. should not be suspended until the February 13 trial. But according to the court docket included in our record on appeal, while a hearing was held on their request on January 28, no order was entered. Instead, motion papers were filed seeking a deposition of the declarant from the lab that administered the test. Someone then moved to continue the trial. On February 11, the trial was continued to March 12.

Docket notations for March 12 indicate nonjury trial proceedings of five hours' duration and a setting of a two-day trial to begin on April 16. No report of proceedings or trial minutes of the several hours of proceedings on March 12 are included in the record on appeal.

According to the record, no trial proceedings took place on the continued trial dates of April 16 and 17. Instead, on April 15, the Vaughns' lawyer obtained an order directing the Department to release information on Ms. England and the Vaughns that the

court was statutorily required to obtain before entering any final order in a nonparental custody proceeding. RCW 26.10.135(2).

In lieu of trial, the docket indicates that a settlement conference was held on April 16. A settlement was evidently reached, because by April 28, the Vaughns' lawyer had filed a notice of presentment of a residential schedule, findings of fact, conclusions of law, and a decree of custody, setting the presentment for May 5. The orders must have been agreed because the trial was never completed.

The presentment went forward on May 5. The 75-page report from the Department required by statute was not completed until April 24 and it was not filed in the superior court until the day the Vaughns presented and the court entered the agreed orders. Department records relating to Ms. England were limited to those generated by Ms. England's earlier-described contacts, in which she sought services, and one contact by Ms. Tedrick in December 2006, after Ms. Tedrick learned that the trial court wanted the Department to become involved.

Thirty-eight pages of the report pertained to the referral history of the Vaughns from 1993 to 1996. CP at 706-43. In his October 2006 guardian ad litem report, Mr. Laws, who reviewed the Department's records, summarized the Vaughns' history with the Department as mostly relating to a "nine-year custody battle" between Ms. Vaughn

11

and her ex-husband, during which "each parent more than once referred the other to [Child Protective Services] for physical or sexual abuse." CP at 640.

According to Ms. England, she entered into agreed orders resolving the custody petition because her sister promised that if she proved she could stay clean and sober and turn her life around, Ms. Vaughn would return Z.C. to her. Ms. England's mother, Ms. Tedrick (who has been an inconsistent witness in these proceedings) testified in 2014, "I constantly question whether I have done the right things where Melissa and Z.C. are concerned; had I simply reported Melissa to the State, I have no doubt that she would have earned her little boy back years ago . . . . *Instead, I trusted Daleena, and asked Melissa to trust her sister.*" CP at 185 (emphasis added).

The Vaughns have consistently testified that they never promised that their custody of Z.C. would be temporary.

The basis for the findings that were presented by the Vaughns and entered by the court is identified as "agreement." CP at 58. Paragraph 2.7 of the findings, entitled "BEST INTEREST OF THE CHILD," states that "[i]t is in the best interest of the child(ren) to be placed in the custody of the petitioner(s)." CP at 60. It goes on to say that "[X] The child(ren) have not been in the physical custody of either parent since

August 3, 2006 because: The natural father is deceased. The natural mother has a current drug problem that places the child in danger." *Id.*

Paragraph 2.8, entitled "ADEQUATE CAUSE," states, "Adequate ca[u]se for this proceeding is agreed as evidenced by the signatures on the last page of this document." CP at 60. A paragraph dealing with limitations on visitation states that, "The Respondent is going to enter a treatment center for addicts. Until the mother is clean from drugs, visitations shall be supervised." *Id.*

The conclusions of law recite that "[i]t is in the best interests of the child to reside with . . . Daleena Vaughn and Richard Vaughn." CP at 61. There is no conclusion of law or any mislabeled finding of fact that Ms. England is a currently unfit parent or that her custody of Z.C. will result in actual detriment to his growth and development.

### Post-decree events

Immediately following settlement of the custody dispute, Ms. England began a one-year residential drug treatment program in Seattle. By terms of the custody decree, the Vaughns were required to take Z.C. to Seattle to visit his mother at the residential facility "no less than 3 times in a nine month period." CP at 65. Ms. England successfully completed the residential program in June 2009. The undisputed evidence is that she has remained clean and sober since.

13

It was not long after Ms. England completed her drug treatment program that she and the Vaughns became locked in disagreement over Z.C. Ms. England claims, "I never gave up hope believing my sister was going to give my son back to me until I had done everything required of me and more only to have her continuously prevent me from seeing my child." CP at 124. In 2010, Ms. England moved for increased visitation with Z.C., testifying by declaration that when her son started living with the Vaughns, it was "with the understanding that it was temporary." CP at 373. Again, the Vaughns deny this claim. Through mediation, the parties arrived at a parenting plan that provided additional visitation to Ms. England, including at her home in Seattle. The revised plan was filed in May 2011.

In December 2011, we ordered publication of our decision in *In re Custody of T.L.*, 165 Wn. App. 268. *T.L.* holds that when a nonparental custody order is entered in a proceeding in which the petitioning nonparent has never overcome the presumption of a fit parent by proving that the parent is unfit or that the parent's custody will be an actual detriment to the growth and development of the child, then the court may not constitutionally require the parent to demonstrate adequate cause for a modification of custody under RCW 26.09.260(1).

In May 2012, characterizing her situation as "on all fours" with *T.L.*, Ms. England filed a motion asking the Asotin County court to transition Z.C. to her full-time custody by August 31, 2012, and to dismiss the nonparental custody action. The Vaughns disputed Ms. England's argument that *T.L.* applied, arguing that "the key for the court [in *T.L.*] was that there was a joinder and therefore, a lack of litigation." CP at 83. They distinguished their own proceeding, in which "there were numerous contested hearings"—"easily 15." CP at 83.

On July 9, 2012, the trial court entered an order finding that adequate cause for hearing the petition had not been established.

In June 2013, Ms. England filed a CR 60(b) motion to vacate the trial court's rulings in the nonparental custody proceeding on alternative grounds. She argued first, that the trial judge, whose law firm had earlier represented Ms. Vaughn, had a conflict of interest, and second, that Ms. England asked her lawyer to appeal the July 9, 2012 ruling, but her lawyer failed to do so. The original trial judge recused himself from further proceedings. In late November 2013, a newly-assigned trial judge denied the motion on multiple grounds.

Some six weeks later, Ms. England filed a second petition for modification. As support, she filed her own declaration, her mother's, and those of co-workers, friends, and

her landlord, which collectively attested to Ms. England's five years' sobriety, her secure employment with a well-known Seattle law firm, her favorable housing situation, her faithful exercise of all the visitation she could financially afford with Z.C.,[3] and actions by the Vaughns alleged to interfere with Z.C.'s relationships with Ms. England and family members who supported her. She argued two substantial changes in the circumstances of her son or the Vaughns: first, that Z.C. "now has a fit parent;" and second, that Ms. Vaughn was isolating Z.C. from Ms. England and other family members. Report of Proceedings (RP) at 5-6.

The trial court was not persuaded that Ms. England's evidence of Ms. Vaughns' alleged isolation of Z.C. established adequate cause for a hearing. It rejected the argument that Ms. England's fitness was a substantial change in Z.C.'s circumstances as unsupported by case law and "plowing new ground." RP at 12.

Ms. England appeals.

## ANALYSIS

Ms. England identifies six issues on appeal. In addition to appealing the trial court's rejection of her two arguments of substantially changed circumstances, she renews

---

[3] At the time of the hearing, Ms. England, who lives in Seattle, exercised visitation with Z.C., who lives some 300 miles away in Clarkston, once every two or three weeks. She talked to him on the telephone every day.

16

the argument that the nonparental custody decree was entered by agreement and without findings that are constitutionally required before a parent can be stripped of parental rights. Br. of Appellant at 3 (issues three, four, and one). She makes a related argument that the modification standard provided by RCW 26.09.260(1) imposes an unconstitutional burden on a parent where the concerns giving rise to nonparental custody have been completely remediated. *Id.* (issue two). Finally, she seeks a change of venue to King County and an award of attorney fees on appeal. *Id.* at 4 (issues five and six).

We conclude that this case is controlled by *T.L.* For the reasons set forth below, we reverse the trial court's 2014 and 2012 orders, deny the motion for change of venue, award Ms. England reasonable attorney fees and costs on appeal, and remand for a hearing at which Ms. England need not establish adequate cause and her fitness as a parent will be presumed.

### I. Under *T.L.*, Ms. England is entitled to a hearing at which she will be presumed fit.

*Parents have a fundamental liberty interest in the relationship with their child that is addressed in the nonparental custody context by case law holding that chapter 26.10 RCW is "constitutional as applied" if a nonparent presents evidence of unfitness or actual detriment.*

Under the Fourteenth Amendment of the United States Constitution, a parent has a fundamental right to the care and custody of his or her child. *T.L.*, 165 Wn. App. at 280-

17

81; *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). "'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the [S]tate can neither supply nor hinder.'" *T.L.*, 165 Wn. App. at 280 (quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). Therefore, "State interference with the parent's right to rear her or his children is subject to strict scrutiny, 'justified only if the [S]tate can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved.'" *T.L.*, 165 Wn. App. at 280 (quoting *In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998), *aff'd sub nom. Troxel*, 530 U.S. 57). Consequently, "[p]rotecting a parent's right to rear her or his child has sometimes required Washington and federal courts to read special protections into custody and visitation statutes when a parent's interest conflicts with that of a nonparent." *Id.*

RCW 26.10.100 provides that the court "shall determine custody in accordance with the best interests of the child." But it is well settled that "best interest of the child" is a constitutionally insufficient basis on which to deprive a parent of parental rights.

*Smith*, 137 Wn.2d at 20.[4] Washington courts have long held that a nonparent seeking custody from a parent must also prove (1) "that the parent is unfit," or (2) "that placement of the child with the otherwise fit parent will result in actual detriment to the child's growth and development." *T.L.*, 165 Wn. App. at 275 (citing *In re Custody of Stell*, 56 Wn. App. 356, 365, 783 P.2d 615 (1989); *In re Custody of Shields*, 157 Wn.2d 126, 144, 136 P.3d 117 (2006); *In re Parentage of M.F.*, 168 Wn.2d 528, 533, 228 P.3d 1270 (2010)).

"A parent is unfit if he or she cannot meet a child's basic needs." *In re Custody of B.M.H.*, 179 Wn.2d 224, 236, 315 P.3d 470 (2013) (examples include "'instances of nonaccidental injury, neglect, death, sexual abuse and cruelty to children by their parents' and 'where a child is deprived of his or her right to conditions of minimal nurture, health, and safety.'" (quoting RCW 26.44.010.)). "Whether placement with a parent will result in actual detriment to a child's growth and development is a highly fact-specific inquiry" and requires "'extraordinary circumstances.'" *Id.* (quoting *In re the Marriage of Allen*, 28 Wn. App. 637, 649, 626 P.2d 16 (1981) (examples include (1) "when a deaf child needed a caregiver who could effectively communicate with the child and the father was

---

[4] The insufficient "best interest of the child" standard "examines the totality of the circumstances and gives equal weight to each household" competing for custody. *Shields*, 157 Wn.2d 126, 141-42, 136 P.3d 117 (2006).

19

unable to do so," (2) "when a suicidal child required extensive therapy and stability at a level the parents could not provide," and (3) "when a child who had been physically and sexually abused required extensive therapy and stability at a level the parent could not provide").

*In T.L., we held that where a nonparent has never proved the heightened standard required by the constitution to obtain custody from a parent, then, in the event a parent moves to dismiss or modify the custody decree, the nonparent can successfully resist the motion only by proving the constitutional requisites.*

A decree awarding custody to a nonparent under chapter 26.10 RCW is never permanent, because custody is always subject to modification under RCW 26.09.260(1). And a parent and a nonparent seeking custody should be free to compromise a custody suit with an agreement that custody will be awarded to the nonparent temporarily while the parent treats or resolves substance abuse or other problems that are interfering with their parenting. A number of reported decisions contemplate just such an arrangement: *In re Parentage of J.A.B.*, 146 Wn. App. 417, 426, 191 P.3d 71 (2008); *In re Parentage of M.F.*, 168 Wn.2d 528, 538-39, 228 P.3d 1270 (2010); *In re Custody of A.F.J.*, 179 Wn.2d 179, 186, 314 P.3d 373 (2013); *In re Custody of B.M.H.*, 165 Wn. App. 361, 375, 267 P.3d 499 (2011), *rev'd in part on other grounds by In re Custody of B.M.H.*, 179 Wn.2d

20

No. 32431-1-III
*In re Custody of Z.C.*

224, 315 P.3d 470 (2013); and *In re Custody of J.E.*, 189 Wn. App. 175, 181-84, 356 P.3d 233, (2015).[5]

Since the nonparental custody proceeding provided by chapter 26.10 RCW constitutionally divests a parent of rights only if the trial court finds parental unfitness or actual detriment, then a parent against whom the constitutional standard is not found to have been proved has a liberty interest that remains undiminished. We held as much in our 2011 decision in *T.L.*

---

[5] In *J.A.B.*, Division One of this court stated:

> A nonparent custody order confers only a temporary and uncertain right to custody of the child for the present time because the child has no suitable legal parent. When and if a legal parent becomes fit to care for the child, the nonparent has no right to continue a relationship with the child.

146 Wn. App. at 426.
In *M.F.*, the Washington Supreme Court quoted this observation with approval as "wisely noted." 168 Wn.2d at 538-39. In *A.F.J.*, it quoted the observation again, this time as "rightly noted." 179 Wn.2d at 186. *J.A.B.*'s observation about the temporary and uncertain rights of a nonparental custodian has since been quoted with approval in *B.M.H.*, 165 Wn. App. at 376 and *J.E.*, 189 Wn. App. at 183.
The Vaughns correctly point out that the statement in *J.A.B.* is dicta—indeed, in each of the decisions we identify, it is dicta. The issue before all of the courts we cite above was de facto parenthood, not nonparental custody.
*J.A.B.*'s observation has likely been repeated so often is because it comports with circumstances and understandings under which courts often see family members agreeing to serve as a nonparental custodian.

21

In *T.L.*, Tia Link's six-year-old son had lived with his grandmother "for most of his life" because Ms. Link had "not been stable or responsible enough . . . to meet [T.L.'s] needs." 165 Wn. App. at 283 (alteration in original). The grandmother petitioned for nonparental custody of T.L., which Ms. Link resisted for almost a year. Eventually, however, Ms. Link filed a joinder in her mother's petition. Agreed findings, conclusions, and orders were entered. Ms. Link claimed she had relinquished control over T.L. only temporarily, with the understanding that she could have her son back when she was "stable." *Id.* at 271. The grandmother denied there was any understanding that her custody of T.L. was temporary.

When Ms. Link filed a petition to modify the custody and residential schedule based on her professed success in achieving stability, a court commissioner concluded, and the superior court affirmed, that Ms. Link had not demonstrated a statutorily required change in T.L.'s or his grandmother's circumstances.

RCW 26.10.190(1) provides that "[t]he court shall hear and review petitions for modifications of a parenting plan, custody order, visitation order, or other order governing the residence of a child . . . pursuant to chapter 26.09 RCW." By its terms, chapter 26.09 RCW applies only to the rights of parents to residential placement and visitation with their own children following a marriage dissolution. It provides that

22

before modifying a prior custody decree the trial court must find, among other matters, that "a substantial change has occurred in the circumstances *of the child or the nonmoving party*." RCW 26.09.260(1) (emphasis added). Missing from the grounds for modification is a substantial change in the circumstances of the parent moving for modification.

In *T.L.*, we held that the modification standards and process provided by RCW 26.09.260(1), (2) and .270 interfered with Ms. Link's right to rear her son and failed strict scrutiny analysis where T.L.'s grandmother had never demonstrated that Ms. Link was an unfit parent or that placing T.L. with her would result in actual detriment to his growth and development. 165 Wn. App. at 284. We recognized that the requirement to prove a substantial change in the child's or nonmoving parent's circumstances reflects a legislative desire to minimize custody litigation between divorced parents, but held that "[i]n a case such as this it is constitutional error to require a parent seeking restored custody of her or his child to satisfy the requirements of RCW 26.09.260 and .270." *Id.*; *see In re Marriage of Thompson*, 32 Wn. App. 418, 421, 647 P.2d 1049 (1982) (discussing a policy of chapter 26.09 RCW to "prevent 'ping-pong' custody litigation").

It was based on *T.L.* that Ms. England moved in 2012 to modify the agreed orders to transition Z.C.'s custody back to her, and to dismiss the Vaughns' nonparental custody

23

petition. She argued that she was never found to be an unfit parent nor was there a finding that her custody of Z.C. would result in actual detriment to his growth and development.

> *When a parent alleges that an agreed nonparental custody decree did not establish parental unfitness or actual detriment, the threshold issue for the court is whether the constitutional requisites were established by the nonparents when obtaining the decree.*

The issue presented by a motion such as Ms. Link's in *T.L.*, and Ms. England's in this case, is whether it *was* determined when entering the custody decree that a parent was currently unfit or that her or his continued custody would result in actual detriment to the child's growth and development.

If a custody decree follows a contested custody hearing under RCW 26.10.140, one would look to the court's findings of fact and conclusions of law to see whether unfitness or actual detriment were found. *See* CR 52(a)(1) and (2)(B) (requiring findings and conclusions). Trial courts must make findings on all material issues; where they fail to do so, appellate courts may direct them to make findings on an issue that is deemed on appeal to be material. *Peterson v. Neal*, 48 Wn.2d 192, 195, 292 P.2d 358 (1956). In the absence of a specific finding, an appellate court may look to a trial court's memorandum

24

opinion or oral opinion to support a general finding. *Backlund v. Univ. of Wash.*, 137 Wn.2d 651, 656 n.1, 975 P.2d 950 (1999).[6]

Here, however, custody was not determined through a contested custody hearing under RCW 26.10.140, so we have no findings, conclusions, or oral opinion or memorandum opinion reached independently by the court. We cannot remand and order the preparation of findings by a judge who did not preside over a completed trial.

The Vaughns nonetheless argue that a number of motions taking place below were "contested," which they argue distinguishes this case from *T.L.* and gives us some outcomes we can consider.[7] But we cannot rely on interlocutory decisions by a court that never addressed the ultimate issue of custody without violating both the statutory mandate that temporary orders "do[] not prejudice the rights of a party or any child which are to be adjudicated at subsequent hearings in the proceeding" and Ms. England's right to due process. RCW 26.10.115(10)(a), U.S. CONST. amend. XIV, § 1.

---

[6] Where the decree is the result of a contested hearing rather than agreement, the trial court is obliged to hold the petitioner to constitutional requirements. If it fails to do so, the right (and duty) to appeal arises. The right and duty to appeal does not arise on entry of agreed orders to an impermanent custody arrangement with no agreed finding of unfitness or actual detriment.

[7] The implication of the Vaughns' argument is that we would view the resolution of the interlocutory motions as being in their favor. Yet while the Vaughns retained temporary custody throughout the proceeding, the orders available to us reveal mixed outcomes for the parties.

Instead, where a nonparental custody proceeding is resolved by agreement, we must look to the agreed findings, conclusions, and decree. Final judgments entered by stipulation or consent are contractual in nature. *Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 942, 974 P.2d 1261 (1999). "When a court order incorporates an agreement between parties, the 'meaning of the order is the same as the meaning objectively manifested by the parties at the time they formed the agreement.'" *Id.* (quoting *Interstate Prod. Credit Ass'n v. MacHugh*, 90 Wn. App. 650, 654, 953 P.2d 812 (1998)).

"Words in a contract should be given their ordinary meaning." *Martinez*, 94 Wn. App. at 944 (citing *Corbray v. Stevenson*, 98 Wn.2d 410, 415, 656 P.2d 473 (1982)). We interpret clear and unambiguous terms as a question of law. *Wm. Dickson Co. v. Pierce County*, 128 Wn. App. 488, 493, 116 P.3d 409 (2005). An unambiguous provision is one fairly susceptible to two different, reasonable interpretations. *Id.* at 493-94. A contract is not ambiguous because the parties suggest opposing meanings. *Id.* at 494.

*We may decide the issue on the basis of* T.L.*, which has been fully briefed by the parties on appeal.*

Before we apply our decision in *T.L.* to the agreed orders in this case, we address a threshold issue: whether argument from *T.L.* is properly before us on appeal. Argument from *T.L.* was sidestepped by the parties in the 2014 proceedings in the trial court, apparently on the basis that the trial court's ruling in 2012 was not timely appealed. Ms.

England assigned error based on *T.L.* in her opening brief in this appeal, however, and the Vaughns have responded to her argument.

The trial court's order denying Ms. England's 2012 motion fails to address her argument that no finding of unfitness or actual detriment was ever made in 2008. Skipping that issue entirely, the court proceeded to find that "[a]dequate cause for hearing the petition has not been established." CP at 91. Ms. England submits that we can resolve this appeal on the basis of *T.L.* because the trial court in 2014 did not hold that the 2012 petition precluded Ms. England's second petition. Br. of Appellant at 22 (citing RP at 10, 28-29).

We need not determine whether Ms. England was entitled to renew her challenge based on *T.L.* in 2014. We enjoy discretion to excuse any delay in her appeal from the 2012 ruling. RAP 18.8(a) provides that the appellate court may, "on its own initiative or on motion of a party, waive or alter the provisions of any of these rules and enlarge or shorten the time within which an act must be done in a particular case in order to serve the ends of justice." Our discretion is subject to RAP 18.8(b), which provides that we will "only in extraordinary circumstances and to prevent a gross miscarriage of justice extend the time within which a party must file a notice of appeal."

27

In *State v. Chetty*, 167 Wn. App. 432, 272 P.3d 918 (2012), the court examined RAP 18.8 in the context of a criminal defendant's late effort to appeal a judgment and sentence entered against him seven years earlier. The "miscarriage of justice" that the defendant contended justified waiver of the time for appeal was not unwarranted incarceration, because Chetty had served his time within months of his conviction. It was, instead, his interest in not being subjected to deportation. The court concluded that RAP 18.8 could apply and remanded for a reference hearing.

As the court explained, "Chetty's motion is governed by RAP 18.8(b) and whether there was a voluntary, knowing, and intelligent waiver of the constitutional right to file an appeal [from a criminal case]. But our disposition is also informed by whether there was ineffective assistance of counsel." *Id.* at 438. Elsewhere, it held that "the effectiveness of counsel is a circumstance that bears . . . on this court's ultimate determination whether to extend the time to file a notice of appeal under RAP 18.8(b)." *Id.* at 444.

Ms. England has testified by declaration that "[a]fter the hearing on July 9, 2012, where my petition for modification was denied, I asked my attorney, Teri Sloyer, to file a notice of appeal. It was not done." CP at 539. Ms. England claims to have later learned that during 2012, Ms. Sloyer faced professional disciplinary proceedings, leading her to resign from the Washington bar in lieu of disbarment and to move out of state. Ms.

28

England filed the publicly-available materials on Ms. Sloyer's resignation in the trial court. They include a statement of alleged misconduct and Ms. Sloyer's affidavit admitting to wrongdoing, both executed in November 2012. The statement of alleged misconduct states that "[d]uring the past few years, [Ms. Sloyer] experienced financial troubles" and identified mishandling of client funds "[p]rior to February 11, 2011." CP at 613. While alleging that "[Ms. Sloyer's] lack of record keeping" made it difficult to ascertain the total amount of mishandled funds, disciplinary counsel obtained Ms. Sloyer's concession to pay restitution to eleven institutions and individuals. CP at 616, 610. Ms. Sloyer's affidavit was executed on November 11, 2012, in Clearfield, Utah, suggesting that she had moved out of state by that time.

While Ms. Sloyer was disciplined for financial misconduct, not lack of diligence, we can infer from the disciplinary documentation that the bar's investigation must have been well along by July 2012. The disciplinary proceeding and impending termination of Ms. Sloyer's legal practice would surely have been a distraction to her. What we find even more significant, however, is that by 2012, Ms. England had been fighting for Z.C. for six years and a challenge based on *T.L.* presented her best opportunity yet to reacquire custody. The record suggests no reason why Ms. England *would not* have instructed Ms. Sloyer to appeal. We find Ms. England's claim of ineffective representation credible.

29

And given the stakes involved, we consider this a case presenting a potential for a gross miscarriage of justice. Ms. England's interest in her parental rights to her only son are as significant, if not more significant, than Mr. Chetty's interest in not being deported from the United States.

The decision whether to extend time for appeal "is determined by the appellate court to which the untimely notice, motion or petition is directed." RAP 18.8(b). We exercise our discretion and treat her appeal as timely presenting the trial court's implicit rejection in 2012 of her argument based on *T.L.*

> *Ms. England has never been found to be an unfit parent or that her custody of Z.C. will be an actual detriment to his growth and development. If the Vaughns wish to pursue their petition, the court should conduct a hearing at which Ms. England will be presumed fit and the Vaughns will bear the burden of demonstrating her current unfitness or actual detriment.*

We turn to the findings, conclusions, and decree to which the Vaughns and Ms. England agreed. When the application of *T.L.* was raised by Ms. England in 2012, each side filed affidavits attesting to their conflicting subjective intentions in entering into the decree, but those are not helpful. "Unilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions." *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994). As explained earlier, we look to the objective manifestation of their agreement.

30

We interpret a contract provision as a question of law when the interpretation does not depend on the use of extrinsic evidence. *Martinez*, 94 Wn. App. at 943 (quoting *Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996)). It was the Vaughns' position in the trial court that the agreed orders unambiguously reveal the parties' mutual intent that Ms. England be found unfit. *See* CP at 82-86.[8]

---

[8] Interpretation of a contract provision is also a question of law when only one reasonable inference can be drawn from the extrinsic evidence. *Martinez*, 94 Wn. App. at 943 (quoting *Tanner*, 128 Wn.2d at 674). Even if we viewed the agreed findings as ambiguous (and neither party argues that they are) the only reasonable inference that can be drawn from the admissible extrinsic evidence is that the most likely outcome foreseeable was a loss for the Vaughns, making it unlikely that the Vaughns would expect, or Ms. England would agree to, anything more than temporary custody.

At the time of the parties' settlement, the Vaughns faced the burden of overcoming a presumption that Ms. England was a fit parent, with clear and convincing evidence. The only evidence adverse to Ms. England's position were (1) the hair tests in August 2006 and January 2008 showing low-level drug use and exposure, and (2) the Vaughns' and Ms. Tedrick's criticisms and their accusations, lacking in foundation, of more extensive drug use by Ms. England. Evidence favorable to Ms. England included the records of Z.C.'s well-baby care, a strong recommendation in her favor from the guardian ad litem, her continued employment, her participation in drug treatment (even if unsuccessful to date), her consistent exercise of visitation with Z.C., Department records that revealed no founded referrals of Ms. England (and to the contrary, the Department's documented position that it was "not informed of any child abuse or neglect issues arising from this case," CP at 701), and third parties prepared to dispute the Vaughns' and Ms. Tedrick's accusations. The statutorily required Department records that were submitted belatedly by the Vaughns were also not helpful to them.

31

The findings and conclusions both state, conclusorily, that it was in the "best interest" of Z.C. to reside with the Vaughns. But as earlier discussed, it was well settled by May 2008 that the "best interest of the child" was a constitutionally insufficient basis on which to award child custody. The early decision in *In re Marriage of Allen*, 28 Wn. App. at 647, for example, observed, "Here the trial court did not find the father *unfit* in the usual sense, but awarded custody under the best interests test. *In this the court erred.*" (Emphasis added.) In holding the nonparental visitation statute unconstitutional in 1998, our Supreme Court held that "short of preventing harm to the child, the standard of 'best interest of the child' is insufficient to serve as a compelling state interest overruling a parent's fundamental rights." *Smith*, 137 Wn.2d at 20. Addressing a parent's liberty interest in the nonparental custody context, the high court stated in *Shields* in 2006, that the constitutionally required unfit parent/actual detriment standard was "a heightened legal standard; *more than the 'best interest of the child' standard.*" 157 Wn.2d at 140 (emphasis added).

In February 2007, this court acknowledged that mandatory court forms included sections and references dealing with a child's "best interest" and therefore did not hold "best interest" findings against the petitioner. But it was only because "the trial court's findings and its oral ruling clearly establish that it applied the heightened *actual-*

32

*detriment-to-the-child standard* required for determining custody between a fit parent and a nonparent." *In re Custody of A.C.*, 137 Wn. App. 245, 262, 153 P.3d 203 (2007) (emphasis added), *reversed on other grounds*, 165 Wn.2d 568, 200 P.3d 689 (2009). In this case, by contrast, there is no mention in any of the agreed orders that Ms. England is currently unfit or that her custody will be an actual detriment to the growth and development of Z.C.[9]

Particularly given the fact that both sides were represented by counsel, we find the absence of any reference in the findings and conclusions to current unfitness to parent or actual detriment to Z.C.'s growth and development compelling. It was well settled in May 2008 that one finding or the other was constitutionally essential. The Vaughns offer no explanation why they believed the agreed orders would be sufficient to strip Ms. England of parental rights without such a finding.

Instead, they point to three findings they urge as implying current unfitness or actual detriment: the statement that Z.C. had not been in the physical custody of a parent

---

[9] The Vaughns point to a reference in the separate residential schedule that Ms. England's residential time would be limited because Ms. England "is an admitted drug addict which poses a threat to the child's growth and development." CP at 52. The reference is not a finding and "a threat" is not "an actual detriment." Read as a whole, the residential schedule provides for visitation by Ms. England and contemplates changes "[a]fter successful completion of drug treatment program." CP at 54.

33

since August 2006 because "[t]he natural mother has a current drug problem that places the child in danger;" the statement, "Adequate ca[u]se for this proceeding is agreed as evidenced by the signatures on the last page of this document"; and the statement, "The following reasons exist for limiting visitation of the mother: . . . The Mother has taken the child with her while she was selling drugs or using drugs. The child was found with methamphetamines in his system. The Respondent is going to enter a treatment center for addicts. Until the mother is clean from drugs, visitations shall be supervised." Br. of Resp'ts at 16 (quoting from CP at 60 ¶¶ 2.7-2.9).

The parties' agreement to "adequate cause" inherently falls short. Chapter 26.10 RCW requires a trial court to deny a motion for a custody order without *any* hearing "unless it finds that adequate cause for hearing the motion is established" by a petitioner's affidavits. RCW 26.10.032(2). "Adequate cause" is demonstrated by an affidavit "(1) declaring that the child is not in the physical custody of one of his or her parents *or* that neither parent is a suitable custodian *and* (2) alleging specific facts that, if true, will establish a prima facie case supporting the requested order." *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 346, 227 P.3d 1284 (2010). In other words, establishing adequate cause is a requirement that "must be satisfied *before the courthouse doors will open* to [a] third

34

party petitioner." *Id.* (emphasis added). It does not entitle the petitioner to an award of custody.

Collectively, the other findings relied on by the Vaughns are of a *"current* drug problem," for which Ms. England "is going to enter a treatment center for addicts," as a consequence of which she will have supervised visitation "[u]ntil [she] is clean from drugs." CP at 60 (emphasis added). Without more, these findings are not fairly susceptible of a meaning that Ms. England "cannot meet [her] child's basic needs." *B.M.H.*, 179 Wn.2d at 236. And references to a substance abuse problem for which a parent needs treatment, without more, cannot fairly be understood to be an "extraordinary circumstance"—substance abuse is, regrettably, a common reason for which a parent loses temporary custody of a child.

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *In re Welfare of B.P.*, 188 Wn. App. 113, 165, 353 P.3d 224 (2015) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)). The same is true where a parent has lost temporary custody to a family member.

Reasonably read, the orders are not fairly susceptible to a meaning that Ms. England was agreed by the parties to be currently unfit or that the parties agreed her custody of Z.C. would result in actual detriment to his growth and development.

*We do not reject, but decline to reach, the additional arguments made by Ms. England and amici.*

Ms. England makes the further argument that the modification standard of RCW 26.09.260(1) "impose[s] an unconstitutional burden on a parent in a dispute over custody with a nonparent where the concerns giving rise to nonparental custody have been completely remediated." Br. of Appellant at 3. She argues, alternatively, that a parent's complete remediation of issues rendering her or him unfit constitute a change of circumstances in the child and that a custodian's acts alienating a child from his mother present adequate cause to proceed to a hearing. *Id.* at 3-4.

Amici curiae, the Northwest Justice Project, and Legal Voice, argue that there is a great disparity in how Washington law addresses situations where a parent faces barriers in caring for a child, which turns on whether parent and child find themselves facing a dependency proceeding or a nonparental custody action:

> In a dependency, the Department is required to submit a permanency plan specifying what services will be offered and what requirements the parents must meet to resume custody of the child. The Department coordinates these services and to the maximum extent possible under current funding levels, must assume the costs associated with remedial

36

> services if the parent is unable to pay. The status of the case must be reviewed by the court every six months. If the Department fails to provide services to remediate the parents' deficiencies, a petition to terminate the parents' rights cannot prevail. Therefore, throughout the dependency process, the Department is required to not only develop a plan for family reunification, but to pay for and help facilitate the successful completion of that plan.
>
> By contrast, once adequate cause is established in a non-parental custody case under RCW 26.10, neither the State nor the non-parent is under any obligation to create a reunification plan with the parent, identify requirements the parent must meet to regain custody of their child, or do anything to facilitate family reunification.

Br. of Amici Curiae at 8 (citations omitted) (internal quotation marks omitted). Like Ms. England, amici "urge the court to ensure that parents like Ms. England may seek to regain custody of their children when the barriers that prevented them from caring for their children are remediated." *Id.* at 2.

We do not reject these arguments but decline to reach them, since the appeal can be resolved on the basis outlined in *T.L.* And it is in the best interest of Z.C. that we resolve the case on a basis that will not unnecessarily protract the process of appeal.

We encourage amici curiae to convey their concerns to the legislature, however. The current situation under which parents' liberty interests require us to read constitutional requirements into the nonparental custody statute is necessary, but it is not desirable. Statutes sometimes can be literally applied to many situations but are "unconstitutional as applied" to some facts. Chapter 26.10 RCW and RCW 26.09.260(1),

given the "best interest" standard of RCW 26.10.100, cannot literally be applied to any nonparental custody situation—"the best interest of the child" will never be a sufficient basis on which to overcome a parent's fundamental liberty interest in her or his relationship with a child. As currently written, the nonparental custody provisions are "constitutional as applied" only where the nonparent goes beyond the proof that they literally require.[10]

It would be fairer to parents and nonparents alike if they were able to rely on the applicable statutes. We encourage the Legislature to amend the nonparental custody provisions to address the constitutional liberty interest of parents and to examine the policy considerations raised by amici curiae at the same time.

---

[10] In Division Two of this court's decision in *In re Custody of R.R.B.*, 108 Wn. App. 602, 621, 31 P.3d 1212 (2001), dissenting Judge Dean Morgan would have avoided this result by recognizing that RCW 26.10.100 was facially unconstitutional, reversing the custody determination, and leaving it to the legislature, if it wished, to enact a constitutional nonparental custody scheme. The parents in *R.R.B.* filed a petition for review of the appellate court's "constitutional as applied" rationale that was initially granted by the Supreme Court but was later denied.

In a Division One decision in *In re Custody of Nunn*, 103 Wn. App. 871, 874 n.1, 14 P.3d 175 (2000) *abrogated by In re Custody of Shields*, 157 Wn.2d 126, 136 P.3d 117 (2006), the court tried to avoid the result by positing an extra-statutory "standing" requirement under which a nonparent would lack standing to seek custody against a fit parent. With the parents' liberty interest protected by the standing requirement, RCW 26.10.100 and RCW 26.09.260(1) could have been literally applied. *Shields* explicitly rejected treating the parent's fitness as implicating standing, however, recognizing that the court's concern was "really a concern about the merits." 157 Wn.2d at 140.

## II. Change of Venue

In addition to seeking reversal or prior orders, Ms. England asks that we enter an order changing venue on account of the initial trial judge's asserted conflict and to serve the ends of justice. While RCW 4.12.030(4) allows venue to be changed when it appears that the judge is disqualified, including because "he or she has been of counsel for either party in the action or proceeding," the original judge not only recused himself, but has now retired. Even more fundamentally, Ms. England offers no authority or argument for the proposition that a motion for change of venue may be directed in the first instance to an appellate court. We deny the motion.

## III. Motion for Attorney Fees

Finally, Ms. England requests an award of attorney fees based on her need relative to the Vaughns' ability to pay, on the authority of RAP 18.1 and RCW 26.10.080. RAP 18.1 authorizes us to award reasonable attorney fees and costs if applicable law grants the party the right to recover them. RCW 26.10.080 provides that "[u]pon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs." In addressing an award of attorney fees and costs in the trial court, the statute provides that an award may be made "after considering the financial resources of all parties."

39

An affidavit of financial need was timely filed by Ms. England as required by RAP 18.1(c). No affidavit of financial need was filed by the Vaughns, nor did they file an answer to Ms. England's affidavit, in which she provided her estimate of their gross monthly income. *See* RAP 18.1(c) (providing deadlines for affidavits and answers). Based on the affidavit filed, there is a significant disparity in the parties' income and resources.

Ms. England's affidavit supports her report that she has been unable to exercise all of the visitation to which she is entitled with Z.C., because she can't afford to. Attorney fees and costs further burden her ability to exercise that right. Because her relative financial need is a statutory basis for an award, is uncontested by the Vaughns, and it is in the best interest of Z.C. for Ms. England to exercise as much visitation as possible subject to the constraints of her employment, we grant the request and award Ms. England her reasonable attorney fees and costs on appeal.

We reverse the superior court's 2012 and 2014 orders, award Ms. England her reasonable attorney fees and costs on appeal, and remand for a hearing at which she need not establish adequate cause and her fitness as a parent will be presumed. Consistent with

40

No. 32431-1-III
*In re Custody of Z.C.*

RCW 26.10.140, the proceeding shall receive priority in being set for hearing.

Siddoway, C.J.

WE CONCUR:

Fearing, J.

Lawrence-Berrey, J.

41