# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Custody of<br><br>P.M.S.,<br><br>          A Minor Child.<br><br>PAMELA SCHIMMEL and<br>IRWIN SCHIMMEL,<br><br>          Respondents,<br><br>and<br><br>MIA SCHIMMEL, aka MIA STANFILL and<br>LARRY STANFILL,<br><br>          Appellants. | No.  50665-3-II<br><br><br><br><br>UNPUBLISHED OPINION |

WORSWICK, J. — Mia Schimmel appeals several related orders that granted custody of her daughter, PMS, to her parents, Irwin and Pamela Schimmel, and placed conditions on Mia.[1] Mia argues that (1) she is constitutionally entitled to appointed counsel, (2) the trial court erred in denying her request for an appointed counsel as an ADA (Americans with Disabilities Act of 1990) accommodation under GR33, (3) she did not receive a trial where she was presumed to be a fit parent, (4) the trial court's orders contain fatal procedural irregularities, and (5) the trial court abused its discretion when it denied Mia's request for attorney fees.

---

[1] We refer to PMS's parents, Mia and Larry Stanfill, by their first names for clarity.  No disrespect is intended.

No. 50665-3-II

We hold that the trial court did not err in ruling that Mia was not entitled to appointed counsel and did not abuse its discretion in denying Mia's attorney fees. However, we hold that the trial court improperly assumed that Mia was an unfit parent during her trial, and that this improper assumption, in addition to the compounded procedural errors, mandate a new trial. Accordingly, we vacate all findings and conclusions regarding Mia's fitness as a parent, reinstate a March 2015 temporary order as it relates to Mia, and remand for a new nonparental custody trial before a different judge. Further, we award $5,000 in attorney fees on appeal to Mia.[2]

FACTS

This nonparental custody petition has been in active litigation since 2013. The procedural history spans almost five years and includes numerous hearings, orders, and a three-phase trial. Mia is the mother of PMS, who was born in 2010. Larry Stanfill, PMS's father, was incarcerated before PMS was born, and remained incarcerated throughout all proceedings involving his parental rights.[3] Mia is the daughter of Irwin and Pamela Schimmel.[4] After PMS was born, Mia would leave PMS in the care of the Schimmels for significant periods of time. Mia suffers from pulmonary arterial hypertension. She historically struggled with drug abuse, specifically methamphetamine. During these proceedings, Mia provided "dirty" urinalysis (UAs) and did not follow through with court ordered drug tests. 3 Verbatim Report of

---

[2] Mia also argues that the trial court abused its discretion when it awarded custody of PMS to the Schimmels, and erred by improperly applying a "best interest of the child" standard. Because we reverse and remand on other grounds, we do not address these arguments.

[3] Larry's parental rights are not at issue in this appeal.

[4] We refer to Irwin and Pamela Schimmel individually by their first names for clarity. No disrespect is intended.

2

Proceedings (VRP) at 313. With the exception of a 15-month period, PMS resided with the Schimmels. During the time Mia had residential custody of PMS, Mia was often late picking up PMS from preschool and was found to have an unsafe home environment.

In December 2012, Mia left PMS with the Schimmels. In January 2013, the Schimmels filed a nonparental custody petition, seeking custody of PMS. In May 2013, the trial court determined that the Schimmels had established adequate cause for hearing the petition, appointed a guardian ad litem (GAL), ruled that primary residential custody of PMS would remain with Mia, and allowed the Schimmels visitation.

In August 2014, the GAL made an unannounced visit to Mia's home. The GAL found "dirty clothes everywhere, food which had been left out for days, and rotten food in the refrigerator." Clerk's Papers (CP) at 332. Rooms were filthy, and the GAL found suspected methamphetamine pipes with residue left out in the open. Mia admitted to the GAL that she had relapsed on methamphetamine.

Following the GAL's visit, the trial court entered a temporary order granting the Schimmels residential custody of PMS. The order also established supervised visitation for Mia through Innovative Services Northwest, provided telephonic visits between Mia and PMS, required Mia to submit to a substance abuse evaluation, hair or nail tests, and UAs, and prohibited all parties from speaking to PMS about the custody dispute.

In December 2014, the GAL issued her report, detailing Mia's temporary custody order violations. The report stated that Mia had failed to complete UAs, failed to provide the results of hair/nail tests, failed to complete a substance abuse evaluation, discussed the custody proceedings with PMS, and missed supervised visits and scheduled phone calls. The GAL also

noted that Mia was "out on bail for criminal charges consisting of Identity Theft, Trafficking Stolen Property First Degree and Possession of Stolen Property First Degree for allegedly pawning her mother's jewelry."[5]  CP at 25.

In response to the GAL report, the trial court entered an amended temporary custody order on March 6, 2015 (March 2015 order).  This order continued to require Mia to undergo random UA testing and to complete a substance abuse evaluation.  It also altered Mia's and the Schimmels' phone call and supervised visitation arrangements and replaced an earlier restraining order.  The trial court also set the trial date (phase one) on the Schimmels' petition for June 29, 2015.

## I. TRIAL PHASE ONE: LARRY'S FITNESS AND THE CR2A AGREEMENT

Phase one of the nonparental custody trial began June 29, 2015.  Immediately before phase one began, Mia and the Schimmels reached a CR2A agreement.  Their agreement provided that the Schimmels could have custody of PMS, but specifically stated that Mia was not stipulating to being unfit.  The CR2A stipulation did not include specific details, but instead, outlined the "broad strokes" of a visitation schedule and drug testing requirements for Mia.  1 VRP at 16.  Mia and the Schimmels swore to the general agreement in open court, stating that further details would be worked out shortly thereafter.  As a result, Mia and her counsel were excused by the court, and the trial court proceeded with trial regarding only Larry's parental rights.

---

[5]  As a result of this criminal case, Mia was subject to a no contact order regarding Pamela.  By November 2016, the criminal case was dismissed.

Following the phase one trial, the trial court ruled that Larry was unfit and granted the Schimmels' petition for nonparental custody. The trial court entered an order containing findings of fact and conclusions of law on August 07, 2015 (August 2015 order). Despite Mia's CR2A agreement that specifically stated she was making "[a]bsolutely no stipulation regarding fitness," the trial court found, "[a]t the beginning of the case, both parents were unfit." 1 VRP at 8; CP at 54.

Moreover, the trial court also made findings of fact to support limitations on Mia's visitation, even though Mia did not stipulate to those findings in her CR2A agreement. The trial court found: "Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions. A long term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions. Significant mental health problems which affect the ability to perform parenting functions." CP at 56. The court order also incorporated the visitation schedule from the March 2015 order "until further order of the court." CP at 56. And the trial court continued a restraining order against Mia based on the pending no contact order in the criminal case. Mia did not attend the presentment of the August 2015 order, however, her attorney approved and signed the order.

By October 2015, Mia and the Schimmels were unable to reach agreement on the specifics of the CR2A agreement. Consequently, the trial court entered an order that struck the CR2A agreement, and set a new trial date (phase two) to address the final terms of the agreed custody order and the terms of Mia's visitation.

## II. TRIAL PHASE TWO: MIA'S VISITATION

At a trial readiness hearing in May 2016, Mia moved under CR 60 to vacate the August 2015 order. Mia argued that she did not assent to the August 2015 order because she did not sign it. Mia also argued that, because the parties had not agreed she was unfit, it was improper for the court to make a finding that Mia was unfit. Despite that the CR2A agreement specifically excluded a determination of fitness and that trial court had previously struck the CR2A agreement, the court ruled that Mia's unfitness had been agreed to by the parties. Thus, the court denied the motion and stated that the upcoming trial was to determine Mia's visitation rights only.

Phase two of the trial began June 20, 2016. Before the first witness was called, the trial court reiterated, "[I]t appeared to me that the parties had resolved the issue of custody and, within that, the underlying unfitness [or] actual detriment."[6] 2 VRP at 183. During phase two of the trial, the guardian ad litem (GAL) testified to Mia's continued noncompliance with the March 6, 2015 temporary order. According to the GAL, Mia had not provided her drug treatment results, had two positive drug tests in 2015, discussed the custody dispute with PMS during visitation, allowed contact between PMS and Larry, and missed visits and phone calls.

Pamela testified to the difficulties of the visitation schedule. Mia testified, describing her drug treatment and explaining the positive UA results were due to her weight loss medication. She also discussed the Schimmels' control over visitation and their noncompliance with the visitation order by canceling or restricting visits and phone calls. Further, Theresa Spencer,

---

[6] We note that the only evidence of a resolution of custody in the record on appeal is the CR2A agreement that the court previously struck.

Mia's sister, testified that Mia showed up to one of PMS's activities unannounced and wanted to take her for ice cream, which the Schimmels did not allow.

Dr. Landon Poppleton, a psychologist, conducted a psychological evaluation of Mia, and his report was admitted at trial. Dr. Poppleton's report concluded that Mia was on a positive path regarding drug abuse, but the resentment and the family power dynamics required a case manager and clear reunification plans. Dr. Poppleton also testified. He stated that much of his information came from Mia's self-reports, and he acknowledged that Mia had not been forthcoming about her history of drug use, criminal activity, or mental health.

After the close of evidence at the phase two trial, and before issuing any ruling, the trial court sua sponte reconsidered Mia's motion to vacate the August 2015 order. On July 6, 2016, the court issued a written ruling and order wherein it stated that its prior decision was not erroneous because Mia's attorney had signed the August 2015 order, but nonetheless reversed its decision on Mia's fitness. In its ruling, the trial court recognized that "there was no agreement [regarding Mia] as to unfitness or actual detriment." CP at 81. The trial court declined to vacate the language that related to Mia in the August 2015 order in a ruling that stated in part:

> [A]lthough the Court will make a ruling as to residential schedule, that ruling and any ensuing order cannot take effect unless the issue of unfitness or actual detriment is established. Accordingly, additional trial proceedings will be required on the issue of unfitness or actual detriment.
> In the trial on the fitness/detriment phase, the stipulated Decree of Custody and Findings of Fact and Conclusions of Law may be admitted to establish the existence of certain relevant facts.

CP at 81.

Thus the trial court, in a puzzling ruling, determined it would make custody and visitation decisions without the required factual foundation of parental unfitness, and stated that it would

make its decision regarding that foundation at a later date. Accordingly, the trial court reserved ruling on the visitation schedule and set another trial date (phase three) to determine Mia's fitness as a parent.

### III. TRIAL PHASE THREE: MIA'S FITNESS

Phase three of the trial was scheduled to begin in October 2016. Before phase three began, the trial court explained the case's procedural posture. The trial court stated that phase two and phase three were a "single trial," but that the determination of fitness and determination of visitation had been bifurcated. The court acknowledged that the procedure was unusual when phase two proceeded with the visitation portion before a determination of parental fitness. The court stated:

> We already heard testimony which assumed that [Mia was] unfit, essentially, and so what would the visitation be going forward, and so—so, yes, that issue of whether or not [Mia is] unfit has to be heard first—or rather, it should be thoroughly fleshed [sic] out. I didn't think the language in the documents really closed that loop for me, so that's what's going to be heard.

4 VRP at 580.

Shortly before phase three of the trial was set to begin, Mia was taken into custody on a criminal arrest warrant. Phase three was continued for a month.

Phase three of the trial explored Mia's fitness and occurred over three days that spanned five months, November 29, 2016 and April 17-18, 2017. Mia made a GR33 ADA accommodation request for an appointed attorney two court days before phase three began, citing her pulmonary arterial hypertension, and she also sought attorney fees under RCW 26.10.080. She admitted that she received approximately $30,000 per year from a family partnership. The trial court denied Mia's requests, concluding that her request was untimely, her physical

8

condition was not a sufficient basis for an appointed attorney, and that she had sufficient financial resources to hire counsel. Mia was not represented by counsel on the first day, but obtained counsel for the latter two days of the trial.

Evidence at phase three included Mia's missed visits with PMS. She missed several visits from January to September 2016, and did not visit with PMS in the fall and winter of 2016, with the exception of one Christmas visit. The contract with the supervised visitation facility was canceled for unpaid bills. However, Mia testified that she was attempting to restart supervised visits and she was current with her visitation fees. Pamela testified to the unstable and inconsistent relationship between PMS and Mia, discussing missed visits and calls.

Regarding Mia's housing, testimony showed that Mia sold her house following phase two, and obtained new housing just before phase three. At some point when Mia was between houses, she lived at an extended stay hotel.

Mia's Narcotics Anonymous sponsor testified to Mia's commitment to sobriety, but admitted that Mia used drugs nearly one year prior, on July 4, 2015. Dr. Poppleton testified that he did not think Mia was fully forthcoming with the information she provided him, and he noted a concern with her inconsistent visitation with PMS. Mia admitted that she had not followed through with the court ordered provisions regarding UAs.

Mia's brother-in-law, Brian Spencer, and Pamela testified regarding Mia's income. Spencer managed a Schimmel family partnership in which Mia had a 25 percent stake. This partnership paid for many of Mia's expenses, including housing and medical costs. Further, the partnership gave Mia a weekly cash distribution of $600. However, the coverage of Mia's expenses and the distributions were purely in Spencer's or Irwin's discretion. Pamela stated,

9

"We are under no obligation to give [Mia] any money either from [the partnership] or personally." 6 VRP at 843.

After the close of evidence, the trial court made clear that the actual detriment test for unfitness was not at issue. During closing argument, when Mia's counsel suggested the Schimmels were arguing that there would be actual detriment to PMS in Mia's custody, the trial court stated that its understanding was that the Schimmels were arguing only fitness and that the evidence did not meet the high standard for actual detriment.

After phase three of the trial, the trial court entered an order that included amended custody findings and conclusions (June 2017 order). The trial court's order incorporated findings of fact from the August 2015 order. At a hearing on presentation of the final order, Mia's counsel questioned why the trial court was including findings and conclusions as to Mia from the August 2015 order when the subsequent trials were to determine findings and conclusions regarding Mia as a parent. The trial court stated:

> My intent is to incorporate any findings I've previously made with regard to [Mia].
>         . . . .
> . . . That information is incorporated in my reason, and I don't know how best to incorporate that. You know, I heard testimony for a few days and we ended up crafting a residential schedule based on that information, *but I also used that information in my decision here on her fitness.*

8 VRP at 1154 (emphasis added). The June 2017 order stated:

> At the time this case was filed:
>
> The child was not living with [Mia]. The child had been living with [Irwin] and [Pamela] since December 30, 2012 at the time of filing.
>
> [Mia] was not a suitable custodian.
>
> **And,**

10

[Mia] is **currently** unfit, or, even if she may be fit, the child will suffer actual detriment (harm) to her growth and development if she lived with [Mia].

CP at 101. The order stated that the above conclusions were based on the following facts:

[Larry] was incarcerated at the time of his trial and has remained incarcerated.

[Mia] failed to submit to random urinalysis testing on a color-line at Lifeline Connections as ordered by the court, signed March 6, 2015, and incorporated in the initial Findings of Fact and Conclusions of Law and the Decree of Non-parental Custody, both dated August 7, 2015; she failed to exercise visitation through Innovative Services NW from the end of September 2016 through her date of trial; she had inconsistent visitation in 2016, which led to termination of supervised visitation by Innovative Services NW in September 2016, which has not resumed; the parties were able to arrange a visit in December 2016, which was not supervised by ISNW; she was inconsistent in initiating telephone calls with the child as allowed by prior court order; she has a history of unstable housing; her recent criminal history resulted in bench warrants, one of which was served on her during a day scheduled for trial in this action; she failed to demonstrate that she is able to provide for the child's basic financial needs; she also failed to work toward reunification; failed to parent; failed to be involved in child's education; and also allowed telephone visits by [Larry] while he was in prison, in contravention of court order.

*The Findings and Conclusions entered by this Court on 8/7/15 are hereby incorporated by reference and supplemented hereby.*

CP at 101 (emphasis added). The order further stated:

The court finds that [Mia] lacks credibility and is consistent [sic][7] in her testimony. Further, [Mia] provided inaccurate and/or incomplete information to Dr. Poppleton. [Mia's] actions and lack of actions throughout this matter show a continuing abandonment of the child.

[Mia] was prohibited from attending the child's school after arriving announced [sic][8] at an extra-curricular activity involving the child and attempting to take the child on a visit, which was outside the visits ordered by the Court. The ensuing disruption was harmful to the child.

---

[7] We assume from context that the trial court meant "inconsistent."

[8] We assume from context the trial court meant "unannounced."

CP at 103. In association with the order, the trial court also signed the residential schedule, the custody order, and a restraining order.

Thus, the trial court determined Mia to be unfit as a parent. Mia appeals the June 2017 findings and conclusions, the residential schedule, the amended final nonparental custody order, and the restraining order.

ANALYSIS

I. APPOINTMENT OF COUNSEL

Mia argues that she was entitled to appointed counsel under constitutional guarantees and under an ADA accommodation in GR33. We disagree.

A.      *There is no Constitutional Guarantee of Appointed Counsel in Nonparental Custody Proceedings*

Mia argues that she had a constitutional right to appointed counsel during these proceedings. Mia asserts that she is entitled to counsel under the due process rights afforded by the Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution.[9] We hold that Mia was not constitutionally entitled to an appointed attorney.

Parents have a fundamental liberty interest to bring up children, control their education, direct their upbringing, and make decisions concerning their care, custody, and control. *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Indigent parents in termination or dependency proceedings have a due process right to appointed counsel at public

---

[9] In passing, Mia asserts an Equal Protection Clause violation, stating "disparate treatment of her, as compared to parents in dependency proceedings." Br. of Appellant at 46. Because Mia's Equal Protection Clause argument is inadequately argued, we decline to address it.

expense. *In re Marriage of King*, 162 Wn.2d 378, 383, 174 P.3d 659 (2007) (citing *In re Welfare of Luscier*, 84 Wn.2d 135, 524 P.2d 906 (1974); *In re Welfare of Myricks*, 85 Wn.2d 252, 533 P.2d 841 (1975)). This is because such cases involve the State's authority to permanently sever the parent-child bond. *King*, 162 Wn.2d at 384-85. Conversely, in dissolution proceedings, the parents remain parents and retain substantial rights, such that the fundamental parental liberty interest at stake is less than those in termination or dependency. *King*, 162 Wn.2d at 386.

In *King*, the court held that dissolution proceedings involving a custody order were fundamentally different from termination or dependency. 162 Wn.2d at 385. Dissolution is a private proceeding with private parties, and the parties retain the future right to modify custody arrangements. *King*, 162 Wn.2d at 385-86. While the State has a role as a judicial decision maker in dissolution, this role is vastly different than the State as an opposing party instituting proceedings against a parent to permanently alter their rights. *King*, 162 Wn.2d at 386. Dissolution proceedings allow the state, through the judiciary, to provide statutory safeguards against erroneous decisions and allow courts to shift expenses between parties. *King*, 162 Wn.2d at 387, 395 (citing RCW 26.09.110, 140, .210, .220). The court examined the due process requirements and held that neither the Fourteenth Amendment to the United States Constitution nor article I, section 3 of the Washington Constitution required appointed counsel in dissolution proceedings. *King*, 162 Wn.2d at 394-95.

A nonparental custody decree is never permanent because it is subject to modification under RCW 26.09.260(1). *In re Custody of Z.C.*, 191 Wn. App. 674, 693, 366 P.3d 439 (2015).

> A nonparental custody order confers only a temporary and uncertain right to custody of the child for the present time, because the child has no suitable legal

parent. When and if a legal parent becomes fit to care for the child, the nonparent
has no right to continue a relationship with the child.

*In re Custody of A.F.J.*, 179 Wn.2d 179, 186, 314 P.3d 373 (2013) (quoting *In re Parentage of*

*J.A.B.*, 146 Wn. App. 417, 426, 191 P.3d 71 (2008)).

Here, similar to dissolution proceedings, the nonparental custody proceeding is between

private parties and does not permanently alter Mia's parental rights. Although the Schimmels

have custody of PMS, when a court determines Mia is fit to care for PMS, she will then regain

custody of her child. Further, the State, through the courts, can guard against erroneous

decisions and shift expenses among parties. *See* RCW 26.10.080; RCW 26.10.090. Because this

is a dispute between private parties and because the proceeding only temporarily determines the

custody of PMS, Mia's right to due process is not violated because she was not appointed

counsel.

B.     *Trial Court Properly Denied ADA Accommodation for an Appointed Attorney*

Mia argues that the trial court erred when it denied her ADA accommodation request for

an appointed attorney because of her pulmonary arterial hypertension with high blood pressure.

We disagree.[10]

We review the interpretation of a court rule de novo and in the same manner as it reviews

statutes. *North Coast Elec. Co. v. Signal Elec., Inc.*, 193 Wn. App. 566, 571, 373 P.3d 296

(2016). We give effect to the plain meaning of a rule as an expression of the drafter's intent.

*Guardado v. Guardado*, 200 Wn. App. 237, 243, 402 P.3d 357 (2017). If a rule is ambiguous,

we read the rule as a whole, harmonize its provisions, and consider related rules to discern the

---

[10] The record on appeal does not contain Mia's ADA accommodation request form, and the
parties' briefs cite only to the verbatim report of proceedings.

rule's intent. *Guardado*, 200 Wn. App. at 243. We review the trial court's decision to grant or deny a GR33 accommodation request for an abuse of discretion. *See Wildermuth v. Wildermuth*, 14 Wn. App. 442, 446, 542 P.2d 463 (1975) (applying an abuse of discretion to the trial court's refusal to appoint counsel).

GR33 governs requests for accommodation by persons with disabilities and provides "measures to make each court service, program, or activity, when viewed in its entirety, readily accessible to and usable by a person with a disability." GR33(a)(1). This includes, "otherwise unrepresented parties to the proceedings, representation by counsel, as appropriate or necessary to making each service, program, or activity . . . readily accessible to and usable by a person with a disability." GR33(a)(1)(C). A court may deny a request for accommodation if the requesting party "failed to satisfy the substantive requirements of this rule." GR33(c)(2)(A).

Viewing GR33's plain meaning, it is clear that the language "as appropriate or necessary to [make] each [proceeding] readily accessible to and usable by a person with a disability" modifies "representation by counsel." As a result, appointed counsel can be an accommodation when it is appropriate or necessary for disabled litigant's access to or use of the proceedings. In other words, the disability must inhibit an unrepresented litigant's access to or use of the courts in such a way that requires the appointment of counsel. Thus, the plain meaning of the rule is to appoint an attorney when the disabled litigant cannot readily access or use the courts without counsel because of their disability.

Here, the court administrator received Mia's ADA accommodation request two court days before the beginning of phase three of the trial. In denying the request, the trial court stated that it was "untimely" and that the request did not "provide a sufficient basis for providing an

15

attorney as an accommodation under the ADA." 5 VRP at 589. The trial court concluded that there is no basis for an attorney as an accommodation for pulmonary arterial hypertension with high blood pressure and its effects. The trial court further stated its belief that Mia's request was an attempt to delay the proceedings.

The trial court, after considering Mia's request, determined that her disability did not impair her in such a way that she would be unable to access or participate in the proceedings. It stated that "pulmonary arterial hypertension with severe blood pressure and the medical fallout of that . . . wouldn't be a basis for an attorney to accommodate that illness." 5 VRP at 589. Therefore, an appointed counsel accommodation was not required under GR33. We agree with the trial court's analysis.

Regardless of its timeliness, because Mia's disability did not interfere with her ability to access the proceedings, the trial court did not abuse its discretion when it denied Mia's ADA accommodation request. Accordingly, Mia was not entitled to an appointed attorney in these proceedings.

## II. NONPARENTAL CUSTODY PROCEEDINGS

Mia argues that the trial court did not properly presume her fitness and that the trial court abused its discretion because the Schimmels failed to prove Mia was unfit to parent or that PMS would suffer actual detriment in Mia's custody. Mia further argues that we should vacate the trial court's August 2015 order and June 2017 order because of the procedural irregularities of these proceedings, and remand her case to a different judge. We hold because of a premature finding of unfitness, the trial court improperly assumed that Mia was an unfit parent during her trial, and that this improper assumption, in addition to the compounded procedural errors,

16

mandate a new trial. Accordingly, we vacate all findings and conclusions regarding Mia's fitness as a parent, reinstate the March 2015 order as it relates to Mia, and remand for a new nonparental custody trial before a different judge.

A.     *Legal Principles*

We review a trial court's custody decision for a manifest abuse of discretion. *In re Custody of C.D.*, 188 Wn. App. 817, 826, 356 P.3d 211 (2015). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *In re Custody of L.M.S.*, 187 Wn.2d 567, 574, 387 P.3d 707 (2017). We review de novo whether the findings of fact support the conclusions of law. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007); *In re Marriage of Chua*, 149 Wn. App. 147, 154, 202 P.3d 367 (2009). We do not review credibility determinations or weigh evidence on appeal. *In re Marriage of Fahey*, 164 Wn. App. 42, 62, 262 P.3d 128 (2011).

Because parents are constitutionally entitled to deference in child custody disputes against nonparents, a court may award custody to the nonparent only if the parent is unfit or if placing the child with the parent would result in actual detriment to the child. *In re Custody of Shields*, 157 Wn.2d 126, 142, 136 P.3d 117 (2006). The nonparental party bears the substantial burden of showing the parent's current unfitness or actual detriment to the child. *Shields*, 157 Wn.2d at 142; *Z.C.*, 191 Wn. App. at 700.[11]

---

[11] The evidentiary standard for determining unfitness is unsettled. *Compare A.L.D.*, 191 Wn. App. at 501 (applying a clear, cogent, and convincing evidentiary standard), *and Z.C.*, 191 Wn. App. at 701 n.8 (applying a clear and convincing evidentiary standard), *with In re Custody of S.H.B.*, 118 Wn. App. 71, 83, 74 P.3d 674 (2003) (applying a preponderance of the evidence standard). However, we need not determine the evidentiary standard to resolve this case.

A parent is unfit if she cannot meet a child's basic needs. *L.M.S.*, 187 Wn.2d at 576. For example, unfitness can include the parent's fault or omission seriously affecting the welfare of the child, the child facing physical harm, illness, or death, or the child being deprived of their right to education. *Shields*, 157 Wn.2d at 142-43. A court determines a parent's fitness by her present condition, not past conduct. *In re Custody of A.L.D.*, 191 Wn. App. 474, 506, 363 P.3d 604 (2015). A parent's past conduct alone cannot establish current unfitness. *In re Dependency of Brown*, 149 Wn.2d 836, 841, 72 P.3d 757 (2003).

In extraordinary circumstances, a nonparent may be awarded custody upon a showing that the placement of the child with an otherwise fit parent would be detrimental to the child. *Shields*, 157 Wn.2d at 145. The actual detriment standard requires a showing that the child's growth and development would be detrimentally affected by placing the child with the parent. *In re Custody of J.E.*, 189 Wn. App. 175, 185, 356 P.3d 233 (2015). Such an inquiry is highly fact specific and requires a case-by-case determination. *L.M.S.*, 187 Wn.2d at 576. A nonparent's ability to provide a superior home environment compared to the parent's is not enough to establish actual detriment. *J.E.*, 189 Wn. App. at 185.

B.      *Mia Had a Trial Where She was Presumed Unfit*

Mia argues that she was not afforded a trial where she was presumed fit. We hold that the trial court erred when it presumed Mia was unfit during the course of the trial.

Parents are constitutionally entitled to deference in child custody disputes against nonparents. *Shields*, 157 Wn.2d at 142. The nonparental party bears the substantial burden of showing the parent's unfitness. *Shields*, 157 Wn.2d at 142.

Here, the trial court stated that phase two and phase three were a single, yet bifurcated, trial determining Mia's fitness and her visitation rights. Because phase three was a continuation of phase two, the court determined that previously admitted evidence from phase two would be considered admitted for phase three.

Before the first witness was called for phase two, the trial court stated, "[I]t appeared to me that the parties had resolved the issue of custody, and within that, the underlying unfitness [or] actual detriment." 2 VRP at 183. The attorneys presented evidence after the trial court made clear that it was presuming that Mia was unfit. But then, at the conclusion of phase two, the trial court recognized that "there was no agreement [regarding Mia] as to unfitness or actual detriment." CP at 81.

Preparing for phase three, the court stated, "We already heard testimony which assumed that [Mia was] unfit, essentially, and [phase two determined] what would the visitation be going forward." 4 VRP at 580. Phase three then presumably was aimed at determining Mia's fitness to parent. At a hearing finalizing the final orders after phase three, the trial court stated that, "I heard testimony for a few days and we ended up crafting a [visitation] schedule based on that information, *but I also used that information* [*from phase one*] *in my decision here on fitness.*" 8 VRP at 1154 (emphasis added).

The trial court presumed Mia was unfit for her nonparental custody trial. The attorneys presented, and the trial court admitted, evidence at phase two under the incorrect presumption that Mia was unfit. The trial court, as the fact finder, carried over phase two evidence into phase three to address Mia's fitness and used this evidence in the determination of her fitness. This presumption of unfitness shaped the entire phase two proceedings, including the witnesses

19

called, evidence presented, and the determinations constituting the ultimate visitation schedule. This was clear error.

Further, the trial court used evidence from phase one, a trial at which Mia was not present, in its ultimate conclusion of unfitness at phase three. These compounding errors tainted the entire process.

Additionally, we find problematic the amount of time it took for these proceedings to conclude. Mia was entitled to a determination of her *current* fitness. *See A.L.D.*, 191 Wn. App. at 506. According to the trial court's reckoning, the nonparental trial began June 29, 2015, and concluded April 17, 2017. The trial court incorporated findings into its final order from proceedings spanning almost two years. Because these proceedings took so long to resolve, we are not confident that the trial court's determination was based on Mia's current fitness, as opposed to her past conduct.

Accordingly, we vacate all findings and conclusions regarding Mia in the August 7, 2015 and June 28, 2017 orders, and remand to the trial court for a new trial on the nonparental custody petition. We urge the trial court to swiftly commence proceedings to resolve this years-old petition. Until the new trial occurs, we reinstate the March 2015 temporary visitation order.

### III. TRIAL COURT'S DENIAL OF ATTORNEY FEES

Mia argues that the trial court abused its discretion when it determined she had an ability to pay her attorney fees. We hold that the trial court did not abuse its discretion by denying attorney fees.

We review de novo whether there is a legal basis to award attorney fees. *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012). We review a trial court's discretionary

award of attorney fees for an abuse of discretion. *In re Marriage of Obaidi*, 154 Wn. App. 609, 617, 226 P.3d 787 (2010). RCW 26.10.080 states: "The court from time to time, after considering the financial resources of all parties, may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorney's fees . . . ."

Here, it is undisputed that the trial court had authority to award attorney fees. In determining whether to award attorney fees, the trial court weighed the financial resources of all parties. The unique financial situation of the Schimmels and Mia was testified to extensively, providing the trial court with an understanding of the family finances and Mia's income through the family business partnership distributions. The trial court cited her income to conclude that she could afford to hire an attorney. Because the evidence supports the trial court's decision that Mia had the ability to hire an attorney, we hold that the trial court's decision denying attorney fees was not an abuse of discretion.

### IV. ATTORNEY FEES ON APPEAL

Mia seeks attorney fees on appeal under RAP 18.1 and RCW 26.10.080. RAP 18.1(a) allows this court to award reasonable attorney fees and costs on appeal if applicable law grants the party the right to recover them. RAP 18.1(c) states that, if the underlying statute requires consideration of financial resources, the requesting party must file an affidavit of financial need.[12] RCW 26.10.080 requires a consideration of financial resources and provides that "[u]pon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs." We must

---

[12] Mia filed the necessary affidavit of financial need with this court.

balance the needs of the party requesting fees against the other party's ability to pay. *In re Custody of B.M.H.*, 179 Wn.2d, 224, 245, 315 P.3d 470 (2013).

We consider the financial resources of the parties, balance Mia's financial need with the Schimmels' ability to pay, and award Mia appellate attorney fees in the amount of $5,000.

## CONCLUSION

In conclusion, we vacate all findings and conclusions regarding Mia's fitness as a parent, and we remand to a different judge for a new trial on the nonparental custody petition. Further, we reinstate the March 2015 order governing visitation. We reverse and remand for further proceedings before a different judge.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Maxa, C.J.

_____
Glasgow, J.