

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 39186-8-III |
| S.B. | ) | Consolidated with |
| | ) | No. 39187-6-III; |
| In the Matter of the Dependency of | ) | No. 39188-4-III |
| | ) | |
| E.G.D. | ) | |
| | ) | UNPUBLISHED OPINION |
| In the Matter of the Dependency of | ) | |
| | ) | |
| L.S.B. | ) | |

COONEY, J. — M.B.[1] appeals an order of dependency as to his three children. The court found M.B.'s children dependent under RCW 13.34.030(6)(c) after a contested fact-finding hearing.

M.B. appeals, arguing there is insufficient evidence to support the court's finding of dependency. We disagree and affirm.

---

[1] To preserve their privacy interests, we use the parties' initials in lieu of their names.

Nos. 39186-8-III, 39187-6-III, 39188-4-III
*In re Dependency of S.B.*

BACKGROUND

M.B. is the biological father and S.G. the biological mother of three children under the age of 10: Stella, Liam, and Emily.[2] M.B. and S.G. met in 2013. S.G. became pregnant with the couple's first child, Stella, in 2014 and soon thereafter gave birth to their son, Liam. S.G. refused to put M.B. on the children's birth certificates, apparently due to the fact that she was still married to someone else, but, when asked, reported that M.B. was the father of the children.

M.B.'s and S.G.'s relationship was rocky and short-lived. M.B. moved out of the house they were renting and limited his visits with S.G. and the children to weekends. Despite his best efforts to tidy the home and bathe the children when he visited, M.B. often observed that S.G.'s home was "destroyed" and that the children "were still wearing the same clothes that they were a week ago." Rep. of Proc. (RP) at 2 RP (Aug. 5, 2022) at 149. M.B. suspected S.G. was struggling with substance abuse and untreated mental health issues.

In June 2016, M.B. left S.G. and the children to return to his home in Illinois. Six months after moving to Illinois, M.B. learned S.G. was pregnant with their third child, Emily. M.B.'s contact with his three children after June 2016 was sporadic, in part due to

---

[2] To protect their privacy, we adopt pseudonyms for the minors. *See* General Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial _courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

S.G.'s inconsistency in answering her phone, which was often shut off. M.B. did not see his children in person again until April 2020, when he visited for a week.[3] At the time of his visit, M.B. observed that the condition of S.G.'s home was "a huge concern," but did not seek to establish paternity or alert child welfare services or law enforcement. 2 RP (Aug. 5, 2022) at 152. He claimed at one point he attempted to contact Oregon Child Protective Services (CPS) to provide information, as CPS had an open case against M.G., but was unable to obtain or exchange any information because his paternity remained unconfirmed. M.B. occasionally sent S.G. and the children money orders from Walmart, but stopped doing so after a time because he "wasn't . . . exactly sure where that money was going." 2 RP (Aug. 5, 2022) at 163.

Around 2018, M.B. began dating A.T., another Illinois resident. A.T. became pregnant a few months into her relationship with M.B., and the pair had a second child shortly after the birth of their first. In 2021, M.B. purchased a home in Illinois. At any given point, there were at least three, and often more than five, children in M.B.'s and A.T.'s home: M.B.'s and A.T.'s two toddlers, A.T.'s two daughters from a previous relationship, and M.B.'s teenage daughter from a previous relationship. The couple's two toddlers and A.T.'s youngest daughter lived in the home full-time. Both A.T.'s oldest child and M.B.'s teenage daughter lived in the home part-time, usually every other

---

[3] This was also the first time M.B. met his youngest child. By that time, it seemed that S.G. had moved with the children to Walla Walla.

weekend. Additionally, the children's cousins and friends often stayed over, such that the couple had "a house full of kids all the time." 2 RP (Aug. 5, 2022) at 134. Because M.B. worked outside the home five days a week, A.T. was the primary caregiver.

Although the couple blended their families in a shared home together, their relationship with each other was not always cohesive. On at least four occasions, law enforcement officers responded to their home in response to the couple reporting domestic disputes against one another. Although neither were ever arrested, in each response, law enforcement officers noted allegations of physical violence, signs of physical violence, or allegations of violence towards a child.

The first call was made by A.T. on June 5, 2019. According to the responding officer, A.T. told her that an argument over the television remote control had escalated into her and M.B. pushing each other. At the time, the couple was going through a break-up. Neither party wished to file a complaint against the other and it was mutually agreed that M.B. would leave the residence for the day. The police report listed M.B. as the suspect and A.T. as the reporting party.

The second report took place on May 25, 2020. According to the responding officer, the couple was having a verbal argument and wished for him to resolve the situation so it would not escalate into a physical confrontation. Both parties said that their argument the night before had become physical, but had varying accounts of who was the aggressor. According to M.B., A.T. had struck him. A.T. disagreed, and stated

4

M.B. had pushed her youngest daughter to the ground. M.B., however, maintained that he simply yanked a bag of chips out of the child's hand while scolding her and that she accidentally fell over when he did so. The parties agreed that they did not want to file complaints against each other and A.T. left the residence for the night "to cool off." 1 RP (Aug. 4, 2022) at 53. The report listed A.T. as the suspect/offender and M.B. as the victim.[4]

Within a month, on June 20, 2020, police were called again by M.B. According to the responding officer, M.B. and A.T. each claimed that the other had physically attacked them. A.T. claimed M.B. was irate and throwing items around. Apparently, when she neared him, he pushed her into a wall. A.T. defended herself by slapping M.B. By contrast, M.B. asserted that he had accidentally knocked something off their dresser, which caused A.T. to grow angry and slap him. Like the previous domestic disputes, neither party wanted to sign a complaint. M.B. decided to leave for the evening. The police report listed A.T. as the suspect/offender and M.B. as the victim.

The fourth incident took place in December 2021. M.B. told a responding officer that in the midst of a verbal argument, A.T. had hit his arms and face. Although it was a dark winter night, the officer could "observe red marks on [M.B.'s] forearms." 1 RP (Aug. 4, 2022) at 58. A different deputy, who did not testify at trial, spoke with A.T.,

---

[4] The officer testified they were required to list a suspect/offender and a victim. 1 RP (Aug. 4, 2022) at 59-60.

who said that it was M.B. who had become physical with her. A.T. also reportedly had red marks on her arm where her shirt had become ripped. Again, neither party wished to pursue a complaint, and M.B. left for the evening. A.T. was listed as the suspect/offender and M.B. as the victim. From December 2021 to roughly February or March 2022, the couple were estranged from one another.

Meanwhile, S.G. continued to struggle to care for Stella, Liam, and Emily. Sometime in 2020, she had a fourth child with her new partner, M.E.[5] In December 2021, the Department of Children, Youth and Families (DCYF) received a report that S.G., M.E., and the children were struggling to secure stable housing and were imminently going to be evicted from S.G.'s friend's home, where they were temporarily residing. It was also reported that S.G. was allegedly abusing substances and oversleeping, causing the children to miss school. The DCYF-assigned social worker, Kristin Smith, observed that the children often showed up to school looking "disheveled." 1 RP (Aug. 4, 2022) at 14. Ms. Smith met S.G. approximately one month later, in January 2022, at S.G.'s maternal great aunt's home in Walla Walla.[6]

S.G. told Ms. Smith that she had used methamphetamine in the past, but insisted she was not currently using. She further maintained she was adequately supervising the

---

[5] For the reasons indicated *supra* p. 2, n.2, a pseudonym has been created for the fourth child and initials in referenced to the father.

[6] Ms. Smith attempted to contact S.G. earlier, but struggled to do so because of S.G.'s housing circumstances.

children and had a housing voucher she intended to use to secure a stable living situation.

DCYF offered S.G. family voluntary services, which she declined. The children were not

brought into DCYF custody at that time.

About a month later, on February 4, 2022, staff at the children's elementary school

contacted law enforcement after the children were found alone at a scheduled home visit.[7]

Law enforcement officers contacted Ms. Smith. Ms. Smith and responding officers

found that the home where S.G. was staying was "very cluttered" and without a walkway

to S.G.'s bedroom. 1 RP (Aug. 4, 2022) at 16. Spoiled food was left on the countertops

and a mattress in the middle of the room was covered in trash, blankets, and boxes.

Although no drug paraphernalia was seen, the children disclosed in private interviews

that S.G., M.E., and the landlord's son, who lived below them, were "'taking medicine'"

by putting "'shots'" in their arms, legs, stomach and feet. Clerk's Papers (CP) at 3. One

of the older children advised authorities to be careful while walking around the home to

avoid getting jabbed by "'the pointy things with the orange caps.'" CP at 3. It was also

observed that Stella and Liam, who were seven and six years old at the time, tended to

take on a parentified, caretaking role over their younger sister and half-brother. The

children reported that M.E. was verbally abusive toward them and would sometimes keep

the baby away from S.G. Due to the conditions of the home, the absence of any capable

---

[7] At that time, apparently, S.G. had secured a different temporary housing arrangement.

7

adult to watch the children, and the children's testimonials, all four minors were taken into protective custody.

Three days later, on February 7, DCYF met with S.G. M.B., who at that point had been contacted by DCYF, attended the meeting virtually. Although invited to join, M.E. did not attend the meeting. According to Ms. Smith:

> [S.G.] appeared to have a flat affect while she was speaking to us [regarding] most of the concerns. She again denied any substance use or leaving the children alone. She did say. . . on the day that we—the children were brought into care that she only left for a short time, however between the time that the school was there [for the home visit] until we showed up she was gone at least an hour. . . . [W]e offered services, we offered random drug testing, counseling. She appeared—she had the appearance of abusing, what I mean she had scabs on her hands and on her face.

1 RP (Aug. 4, 2022) at 18-19.

At the meeting, M.B. expressed that he would be willing to take a DNA[8] test to establish paternity and that he was prepared and desired to assume custody of his three children. Since he was unconfirmed as the children's father, their maternal great-aunt, Sandra Cobb, took temporary custody. Once the children were brought into Ms. Cobb's care, M.B. was able to maintain more consistent contact with them, visiting two to three times per week through the Facebook Messenger application. However, M.B. did not see the children in person again until the time of trial, which was in August 2022.

---

[8] Deoxyribonucleic acid.

Following the February 7 meeting, S.G. disclosed to Ms. Smith that she did not want M.B. to assume custody of the children. She said that M.B. was violent during their relationship and that he had raped her. When later asked about this accusation, M.B. "denied that [his conflict with S.G. ever became] physical except for one occasion . . . around Christmas time there was an altercation where he had spit and hit her several years ago." 1 RP (Aug. 4, 2022) at 41. In late March, S.G. admitted to Ms. Smith that she was abusing methamphetamine and fentanyl, but claimed she desired DCYF's assistance in working toward sobriety.

As of July 2022, S.G. had failed to undertake any active efforts to achieve sobriety and expressed her belief that the children were exaggerating the conditions of their home life under her and M.E.'s care.

In March 2022, M.B. was confirmed as the biological father of Stella, Liam, and Emily. Although DCYF was impressed with M.B.'s consistent communication efforts, continuous employment history, and desire to assume care of his children, social workers hesitated to uproot the children to Illinois given the various police reports concerning domestic disputes between M.B. and A.T. As such, they asked the couple to "participate in counseling to address their patterns of fighting and create a plan to manage so it does not interfere with parenting." CP at 140. M.B. was ambivalent about participating in counseling services but agreed to try it. Between May and June 2022, the couple met with a provider three times. M.B. ended counseling because it was too expensive, at

which point DCYF offered to pay. M.B. and A.T. also expressed that they discontinued the counseling sessions because they found the sessions unhelpful. The couple's counselor, by contrast, believed that the pair were "unwilling to set goals and work together to fix their situation." CP at 140. The counselor provided the following text messages A.T. had sent to her in May 2022 regarding M.B.:

> ". . . [M.B.] is mentally abusive as well, Controlling as mean. When [we] split in December this is where we came resulting in him calling Me names yelling at me and breaking a crystal vase. . . .
>
> "Please . . . update [me] if he decides to get help. I will not be the only one going places, I was going to admit myself to a mental institution because he made me feel crazy and I wanted to die.
>
> . . . [M.B.] is being really mean and constantly reminding me of how I'm [sic] don't work I don't do anything and I need daycare to get a break from being a mother and I just can't deal with this I can not. I'm only here cause I have nowhere to go. Love is not being screamed at on a 30 minute ride home. I left last night! I'm at my dad's till her [sic] gets here. This is not love this is us afraid to start over. This is him pretending to want me so I stay so he has a full time sitter for his 3 kids coming. I just can't."

CP at 134.

In addition to providing the couple with counseling services, Katie Johnson, a DCYF reunification services worker, also wanted to conduct an interstate compact for the placement of children home study to determine whether M.B.'s and A.T.'s relationship troubles posed any risk to the children's physical or psychological well-being. A study had not been arranged or completed by the time of the fact-finding hearing.

10

A two-day fact-finding hearing was held on August 4 and 5, 2022, regarding whether the three children were dependent under RCW 13.34.030(6).[9]  During her testimony, A.T. retracted her text message statements made three months earlier to the couple's counselor, saying they were made when she was off her medications[10] and during a fight with M.B. where she intended to anger him.  She testified that she regretted the messages because they were "completely opposite of how [she] really fe[lt]" and that she was enthused and supportive of taking on more children.  1 RP (Aug. 4, 2022) at 99.  At the same time, she added that while she did not think M.B. needed anger management, he was "going through a lot" and sometimes grew "upset . . . and really emotionally sad."  1 RP (Aug. 4, 2022) at 99.  Reportedly, A.T. and M.B. had broken up and gotten back together a few times between May and June 2022.

Both A.T. and M.B. testified that, although they were no longer receiving counseling services, they had sorted out most of their conflict.  This apparently stemmed from A.T.'s youngest daughter and one of the couple's toddlers having behavioral issues

---

[9] S.G. stipulated to the order of dependency.  She and M.E. also stipulated to the order of dependency as to the fourth child.

[10] Ms. Johnson and M.B. testified that A.T. suffers from bipolar disorder and depressive disorder.  A.T. admitted that in the past she was inconsistent about taking her medications, but at the time of trial she informed the court that she had been consistently taking her medications as prescribed.  M.B. also apparently took medications for a depressive disorder.

and due to A.T.'s inconsistency in taking her medications. However, M.B. stated he would complete any court-ordered counseling required for reunification.

M.B. also sought to clarify why the couple had contacted law enforcement so frequently. He said the calls were "usually over something silly," but were always made with the intention to avoid the fights escalating into physical conflict or an arrest. 2 RP (Aug. 5, 2022) at 129. M.B. further testified that he and A.T. now had a three-step plan to work out their problems before going to the police: first, to recognize that the conflict was escalating and to avoid any fighting in front of the children; second, to separate if needed; and third, to regroup later when emotions had cooled if the issue required further discussion. The couple had recently moved from their smaller home to a larger home that allowed them to more easily separate during periods of disagreement.

At the time of the fact-finding hearing, A.T. was set to begin a new job as a certified nursing assistant, that would place her out of the home three days a week from 2:00 p.m. to 10:00 p.m. This overlapped slightly with M.B.'s work schedule, which was Monday through Friday, for 8 to 10 hours a day. M.B. admitted that his work days were long and that he sometimes fell asleep while on video chats with his children in Washington. Although the couple lacked a plan for childcare on the days they both planned to work, they each provided a list of potential babysitters, that included their teenage children, siblings, niece, cousin, cousin's daughter, and neighbors.

Different providers offered inconsistent conclusions about whether the children should be found dependent. Ms. Johnson, the child and family services worker from DCYF, worried that M.B.'s and A.T.'s relationship troubles would exacerbate the children's behavioral problems.[11] Though none of the children had received a formal diagnosis of a psychiatric condition, during a child health screening Stella and Liam both scored high for internalizing their emotions, meaning they had the tendency to try to self-manage their symptoms—which could include "depression and anxiety"—rather than seeking help from an adult. 1 RP (Aug. 4, 2022) at 69. For Stella, this self-internalization often manifested in a tendency to ignore and distrust adults, while Liam sometimes grew physically reactive. All three children were enrolled in counseling at the time of the fact-finding hearing. Oppositely, the children's counselor suspected that Emily, the youngest child, possibly struggled from "disorganized attachment," meaning she was overly friendly with strangers and struggled to "discern who's safe and who isn't." 1 RP (Aug. 4, 2022) at 69.

Based on these behaviors, Ms. Johnson testified that she believed an order of dependency was appropriate until M.B. and A.T. had successfully completed counseling and had undertaken a home study. Specifically, Ms. Johnson was concerned that the conflict in M.B.'s and A.T.'s home, and particularly the frequent presence of law

---

[11] Ms. Smith, the social worker, did not make a recommendation, likely because she handed the case over to Ms. Johnson early on.

enforcement officers, would aggravate the children's feelings of chronic insecurity. She testified that the children were traumatized from their removal from their mother's home by law enforcement and "it's a real concern of theirs" that the same thing would happen with their father. 1 RP (Aug. 4, 2022) at 68. She stated that the conflict between the couple, at worst, posed a risk of "serious injury or death" to the children and, absent that, caused "elevated depression, insecurity and behavior problems" in the children. 1 RP at (Aug. 4, 2022) at 68. She speculated that these mental conditions, if left untreated, could affect the children's future academic performance and ability to form future relationships. On cross-examination, Ms. Johnson testified she had not observed that the children were impacted by M.B.'s relationship choices. Likewise, Bry Williams, the counselor who visited with M.B. and A.T. before they discontinued her services, opined "there is still conflict in the home that would not be conducive for additional children to be added to the home during these circumstances." CP at 135.

By contrast, the children's court-appointed special advocate (CASA), Rochelle Short, recommended the children be placed with M.B. As she explained,

> [M]y initial recommendation was [that] it would be in the best interest of the children to remain dependent and for us to do a further study of [M.B.] and his home situation in Illinois. But given the information I have learned over yesterday and today, my recommendation [has shifted] . . . He's always showed up for his kids, whether it be hearings, or what I've heard from the children's caregiver, Ms. Cobb, she's been nothing but complimentary to [M.B.]'s consistency with the children. He established paternity. I think he has a right to parent his children. . . . I, of course, have had concerns as well about [A.T.]'s relationship with [M.B.] and I hope

14

> they continue to work on their relationship for the interest of the children. But also the children have expressed to me on numerous occasions [that] they would like to live with their father as well, so, that is my current stance.

2 RP (Aug. 5, 2022) at 178.

At the conclusion of the fact-finding hearing, the court expressed it struggled in deciding whether to find the children dependent, due, in part, to the fact that there were conflicting recommendations. Ultimately, the court found the children dependent under RCW 13.34.030(6)(c). The court set out its reasons for doing so in a detailed oral ruling.

First, the court explained that, prior to the children's removal from the home, there was a lack of consistent communication between M.B. and the children. M.B. had never lived full-time with the children, had not met Emily in person until she was four years old, had only a couple of in-person visits over a six-year period, had never sought to establish paternity, and never attempted to obtain a parenting plan. The court was dubious as to whether M.B. would have ever began having consistent contact with the children had DCYF not initiated their removal. The court was also troubled by the fact that M.B. had never undertaken serious efforts to ensure the children's safety despite his suspicions that S.G. was suffering from substance abuse problems and untreated mental health issues.

Regarding the interactions between M.B. and A.T. and their ability to manage three more children, the court also voiced a number of concerns:

15

Another factor the Court is considering is the history of domestic disturbance calls in Illinois which the Court believes would have resulted in arrests had those calls been made in Washington, where evidentially in Illinois parties have the right to decide whether they want to proceed forward. That's not the case in the great state of Washington.

[M.B.] testified that some of those calls stemmed from his interactions between himself and [A.T.]'s [younger] daughter [who had behavioral issues]. Adding more children will not reduce the stress in this household. It's also unknown how [A.T.] would deal with the additional children and the inevitable stress they would bring. And while both [M.B.] and [A.T.] point the finger at the other as being the aggressor in some of these calls, that's not the issue for the Court. The issue for the Court is the overall environment and the overall stability. . . . [I]t's not . . . important who is the aggressor and who wasn't[,] it's the overall situation in which these children would be moving to.

. . . .

[M.B.'s] testimony was that his house is "hectic and chaotic" with the current number of children residing there. Adding three children cannot reduce that chaos. He also testified that the DCYF issues that were presently occurring have added to the stress with his relationship with [A.T]. As stated before, the Court believes these children experienced a lot of trauma and may well have some special needs resulting from that . . . and the evidence presented to the Court shows a substantial lack of stability in the household in Illinois.

. . . .

Moreover [the] plan to simply not fight in front of the children is not a real plan to reduce conflict and turmoil between [A.T.] and [M.B]. [A.T.'s] testimony that everything has been great for the past eight months is simply not credible in light of her text messages to the counselor and the letter from the counselor.

. . . [M.B.] testified that his plan would be to leave if things got to [sic] contentious. And again the Court is left to wonder how does leaving the situation benefit these children? There has not been evidence of a real plan to reduce conflict and add stability to the household and while one party leaving to cool off may help in avoiding law enforcement involvement, it does not in the Court's opinion provide stability for the children.

[M.B.] testified that he sometimes has found it hard to have a video call with the children because he would fall asleep from working so hard.

16

> And that is not a criticism, sir. I hope you understand that. These children need stability and work schedules are going to force a potential revolving door of caregivers.

2 RP (Aug. 5, 2022) at 194-96.

The court also accounted for the fact that under Ms. Cobb's care, M.B.'s three children were living with their sibling, a half-brother, but acknowledged that situation could change given that their half-brother had a different father. Finally, the court noted the couple lacked a plan for childcare while they are both at work.

Despite these concerns, the court ended on a hopeful note, stating that pending a future home study and "real substantive counseling with regard to conflict and anger management," it believed that the dependency could be a short one with M.B.'s and A.T.'s cooperation. 2 RP (Aug. 5, 2022) at 197. The court later signed a stipulated disposition order which continued to provide for the children to reside with Ms. Cobb.

At a dependency review hearing held three months later, in November 2022, the court found that M.B. had only partially complied with the earlier court order. Specifically, it noted that M.B. was cooperating with the home study process, but had not participated in family counseling and infrequently participated in virtual visits with the children, often for less time than was allotted. According to a report from the children's CASA, M.B. and A.T. were once again estranged from one another at the time of the review hearing. M.B. was caring full time for the two children he shared with A.T. and

17

had hired a full-time babysitter for the children on weekdays between 5:00 a.m. and 6:30 p.m.

M.B. timely appeals the orders of dependency.

ANALYSIS

M.B. contends the court erred in finding the children dependent under RCW 13.34.030(6)(c) because the order was not supported by substantial evidence.

Parental custody of a child is a fundamental right, guarded by the Fourteenth Amendment to the United States Constitution. *In re Custody of Smith*, 137 Wn.2d 1, 13, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). "'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944)). Given the fundamental right to parent one's child, state interference is justified only if the State can show that it has a compelling interest and that such interference is narrowly drawn to meet only the compelling interest involved. *Smith*, 137 Wn.2d at 15; *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). With these principles in mind, we turn to the State's ability to intrude into the parent-child relationship.

18

A dependency transfers legal custody of a child to the State, thus interfering with a parent's fundamental right to parent their child. *In re Dependency of Ca.R.*, 191 Wn. App. 601, 608, 365 P.3d 186 (2015). At a fact-finding hearing to determine the veracity of allegations made in a dependency petition, the petitioner bears the burden of establishing that a child is dependent. *In re Dependency of Schermer*, 161 Wn.2d 927, 942, 169 P.3d 452 (2007). In conducting a fact-finding hearing, trial courts must walk a wary line between a parent's fundamental liberty interest in the care and custody of their children and the practical reality that dependencies serve, and the important function of remedying family problems and providing needed services for the welfare of children. See *In re Welfare of H.Q.*, 182 Wn. App. 541, 550, 330 P.3d 195 (2014); *Schermer*, 161 Wn.2d at 942.

Because a dependency hearing hinges on witnesses' testimony and presentation at a fact-finding hearing, we defer to the trial court's judgment of witness credibility and weighing of the evidence. *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013); *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Forsooth, the trial court is in the best position to hear testimony and observe witnesses. *In re Dependency of M.P.*, 76 Wn. App. 87, 91, 882 P.2d 1180 (1994).

In a challenge to a finding of dependency grounded in insufficiency of the evidence claims, we will "affirm [the] order of dependency as long as substantial evidence supports the court's findings of fact and the findings support the conclusions of

law." *In re Dependency of M.S.D.*, 144 Wn. App. 468, 478, 182 P.3d 978 (2008).

"Evidence is substantial if, when viewed in the light most favorable to the party

prevailing [in the trial court], a rational trier of fact could find the fact more likely than

not to be true." *Id.*; *see also In re Dependency of D.L.B.*, 188 Wn. App. 905, 914, 355

P.3d 345 (2015) ("The determination of whether findings of fact are supported 'must be

made in light of the degree of proof required.'") (quoting *In re Dependency of P.D.*, 58

Wn. App. 18, 25, 792 P.2d 159 (1990)), *aff'd*, 186 Wn.2d 103, 376 P.3d 1099 (2016).

Unchallenged findings of fact will be treated as verities on appeal. *In re Welfare of*

*L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010). When, however, a trial court

makes a conclusory legal determination of dependency that is unsupported by specific

findings of fact necessary to support the conclusions, "the reviewing court may, if not

must, make an independent scrutiny of the record to determine whether those underlying

facts are present." *In re Dependency of Q.S.*, 22 Wn. App. 2d 586, 610, 515 P.3d 978

(2022). Findings grounded in evidentiary violations, such as testimonial hearsay, will not

be sustained. *Id.* at 613.

Here, M.B.'s and S.G.'s children were found dependent under RCW

13.34.030(6)(c),[12] which defines a dependent child as one who "[h]as no parent,

---

[12] The statute was renumbered in 2009. LAWS OF 2009, ch. 520, § 21. Older decisions interpreting this subsection refer to it as RCW 13.34.030(5)(c) rather than (6)(c).

guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." As this language makes clear, a substantial danger to the child by itself is insufficient; instead the parent's incapability must pose a substantial danger to the child's psychological or physical *development*. *Q.S.*, 22 Wn. App. 2d at 609. The "substantial danger" does not yet need to have manifested into actual harm. *See In re Welfare of Frederiksen*, 25 Wn. App. 726, 733, 610 P.2d 371 (1979) ("Nothing in the statute suggests that the [State] must stay its hand until actual damage to the endangered child has resulted."). In evaluating a finding of dependency under this clause, we will account for any special needs of the children and "any limitations or other circumstances which affect a parent's ability to respond to those needs." *Ca.R.*, 191 Wn. App. at 608.

Washington courts have outlined several limitations on a finding of parental incapability that are relevant to this appeal. For example, a mere independent lack of resources to cope with a child's special needs is insufficient to justify a dependency. *Schermer*, 161 Wn.2d at 945 ("[T]he dependency [cannot be] based solely on a parent's lack of financial resources."). A parent is capable even though they may lack financial or other means to meet a child's unique needs if the parent willingly engages with the community or other public services to color in those gaps. *See, e.g.*, *Q.S.*, 22 Wn. App. 2d at 615 (deeming a father, who took advantage of available resources to meet his

autistic son's needs, a capable parent). Likewise, a parent's erratic behavior or engagement with third parties or domestic partners does not necessarily render the parent incapable. *Id*. at 611 ("The State does not take away children because of parental anger."), 613-15.

Similarly, in *M.S.D.*, Division One of this court reversed a finding of dependency where the child's mother allowed her boyfriend, a convicted child abuser, to live with her and her daughter because there was no evidence that the boyfriend posed a substantial risk to the child's development; instead, the trial court grounded its finding of dependency in the judgment that the boyfriend was not good for the mother. 144 Wn. App. at 482. Finally, as the parties acknowledged at trial, mental illness may not result in a finding that a parent is incapable unless that illness precludes them from fulfilling their parental obligations. *Q.S.*, 22 Wn. App. 2d at 611.

I. SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING THAT M.B.'S AND A.T.'S CONFLICT POSED THE RISK OF SUBSTANTIAL DAMAGE TO THE CHILDREN'S PSYCHOLOGICAL DEVELOPMENT

M.B. first contends that his domestic disputes with A.T. did not pose a substantial threat to the children's psychological or physical development and that "there was nothing extraordinary about [his] conflict" with A.T. Br. of Appellant at 19. Specifically, he claims that his and A.T.'s conflict had no effect on the children and that any claims to that end were speculative, that they had a valid plan to address their conflict, that their police calls had nothing to do with domestic violence, that Ms.

Johnson's predictions of harm were speculative, and that the children loved him and wanted to live with him.

Our Supreme Court has recognized the psychological harm that witnessing one parent assault the other has on a child. *Rodriguez v. Zavala*, 188 Wn.2d 586, 596-97, 398 P.3d 1071 (2017). In *Rodriguez*, the Supreme Court stated "[s]cholarly research supports the conclusion that exposure to domestic violence is a simpler, more insidious method of inflicting harm." *Id.* at 597. "While exposure to abuse may not leave visible scars, the secondary physical and psychological effects of exposure are well documented." *Id.*

As to M.B.'s claims that the children were neutral about the conflict, a plan was in place to address the conflict, and the police calls were unalarming, the court wrote:

> The court finds that this child has suffered substantial trauma as a result of the events that [led] the Department to file the Dependency Petition. . . . [M.B.'s and A.T.]'s relationship creates household conflict that has required law enforcement intervention, and that conflict is likely to persist into the future. The court does not believe that placement of three more children into [M.B.]'s household will reduce that conflict, nor [does] the court believe that [their] plan to address the conflict, i.e. walking away from arguments, evidences a real plan to reduce conflict in the household. The court believes that it is not in this child's best interest to be placed in a household with ongoing conflict issues.

CP at 183; *see also* 2 RP (Aug. 5, 2022) at 194-96 (oral ruling).

The foregoing affirms that the trial court's judgment about M.B.'s and A.T.'s conflict was grounded in its concerns about the children's psychological traumas

stemming from the children's removal from S.G.'s and M.E.'s home. M.B. does not contest that the children were removed from S.G.'s care due to a myriad of issues, including her substance abuse problems, housing insecurity, hoarding tendencies, inability to properly clothe and bathe the children and bring them to school, and conflict with M.E., who was also an active drug user. Additionally, M.B. does not challenge Ms. Johnson's testimony that the children were nervous that, once settled in Illinois, law enforcement would remove them from their father's care as they did previously, or that the older children were parentified and untrusting of adults.

Given the uncontested evidence regarding the children's background and unique needs, it is unsurprising the trial court found that a home marred by parental conflict and occasionally visited by law enforcement, would not be a conducive environment to assuage the children's anxieties about being removed from their parents by law enforcement or CPS a second time. M.B.'s and A.T.'s inability to manage their own conflict without the assistance of law enforcement officers, coupled with A.T.'s admitted attempts to bait M.B. by texting their former counselor, reveals the two lack the tools necessary to reassure the children and assist them with their own internalization of emotions and related behaviors.[13] If we are to take A.T.'s allegations of abuse seriously

---

[13] M.B. argues that A.T. was the aggressor, not him. But that ignores other evidence, which painted him as sometimes physically violent, and the reality that Illinois police were required to enter someone as a victim, which, if we are to follow the police reports, seemed to usually be the person who called first. More importantly, as the trial

—which would be reasonable in view of S.G.'s sexual assault allegation and M.B.'s admission he had previously spit on and hit S.G.—then the interests against placing the children with him become even weightier, given the children's own experiences with M.E.'s domestic violence toward themselves and their mother. The fact that other children would be unbothered by their father and his girlfriend fighting is irrelevant to our analysis, which requires us to evaluate the issues in view of the children's special, individual needs. *See 2* RP (Aug. 5, 2022) at 198 ("[T]he Court's concern is . . . much more . . . with the psychological and emotional aspect and trauma that the children have gone through . . . let's make sure it doesn't get repeated.").

Moreover, M.B.'s insistence that the conflict never directly involved the children is unsupported by the evidence, which suggested that A.T.'s youngest daughter's behavioral problems were a major source of contention between the two. Although both he and A.T. indicated that problem had been somewhat redressed, there is no telling how the addition of three children would change sibling or parental dynamics.

Regarding the couple's plan of action to handle future conflict, the trial court was in the best position to determine whether such a plan would actually resolve the conflict. As the court described, M.B.'s and A.T.'s plan was not directed at mitigating conflict, but

court pointed out, the question of who was the first aggressor in these fights was not at issue; the problem was "the overall environment and the overall stability" of the home. 2 RP (Aug. 5, 2022) at 194.

25

instead primarily described removing themselves from the children, and then, if the fight escalated, from each other. The court wisely noted that walking out mid-fight would only aggravate the children's fears of abandonment. Additionally, A.T.'s and M.B.'s separations and reunifications over the course of the few months running up to the fact-finding hearing (and reported separation at the time of this appeal) suggests that their plan to reduce conflict was either not seriously being put into practice or was ineffective.

Still, related to the first issue, M.B. argues that Ms. Johnson's testimony about the impact of the couple's conflict on the children's development was speculative and was undercut by the testimony of the CASA. To the extent M.B. complains the CASA's testimony undercut Ms. Johnson's testimony, that creates an issue of witness credibility that we are proscribed from reviewing on appeal. Regardless, the trial court could easily discredit the CASA's testimony due to her maintaining one position until the time of the fact-finding hearing, where she suddenly changed her mind while on the witness stand.

Additionally, Ms. Johnson's testimony about the impact of M.B.'s and A.T.'s conflict on the children did not waiver. When asked whether placement with their father would "constitute a danger of substantial damage to their physical or psychological development," Ms. Johnson answered with an unwavering, "Yes." 1 RP (Aug. 4, 2022) at 71. She specified that there was a substantial danger that the children would struggle to overcome their issues of internalization and attachment disorders as they developed without a consistent, emotionally-stable set of parents.

M.B. points out that, when asked how this damage would *specifically* manifest if the children were left in his care without DCYF intervention, Ms. Johnson qualified that she could only speculate how the children's development in a conflict-heavy home would impact their futures. Ms. Johnson opined, from her own personal experience as a social worker, that unredressed conflict between the heads of the household in cases where children struggle with emotional dysregulation may lead to poorer academic or interpersonal outcomes for those children down the road. She answered unequivocally that introducing the children into M.B.'s home absent counseling or other intervention would "elevate[ their] depression, insecurity, and behavior problems." 1 RP (Aug. 4, 2022) at 68. This acknowledgment of future harm to their psychological development was independently sufficient and appropriately credited by the trial court.

Finally, M.B. asserts that his children love him and want to live with him, and that he desires the same. His assertion is undisputed. The trial court appropriately addressed this at the conclusion of its oral ruling when it acknowledged that it was aware of M.B.'s affection for his children and that it had faith he would continue to work toward reunification.

II. SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING THAT M.B. LACKED CONTACT AND HAD NOT ESTABLISHED A BOND WITH HIS CHILDREN IN THE YEARS LEADING UP TO DCYF'S INTERVENTION

M.B. next asserts the court erred when it made contrary findings related to his bond with the children. Although the court's findings are somewhat contradictory, the

court's reference to the "lack of a bond" related to M.B.'s pre-DCYF intervention contacts with the children, rather than his contact with the children after February 4, 2022. Specifically, the court wrote:

> In making this determination, the court first finds that [M.B.] has not been a part of a family unit and lacks a bond with the above named child. Since leav[ing] the State of Washington in 2016, the father has had one in-person contact with the child. The father did not take steps to have any substantial contact with the child. [The] Court is concerned that, absent DCYF intervention in this case, the lack of contact would have been even longer. . . . [M.B.]'s family time with his children is consistent and there is a clear bond between the children and [M.B].

CP at 183.

As the foregoing makes clear, the court's written analysis was divided between M.B.'s pre-DCYF and post-DCYF contacts with the children. This is even more obvious in light of the court's oral ruling, which discussed its concern that the children had never lived with M.B.; that there was little contact between the children and M.B., in-person or via the phone prior to DCYF intervention; and that M.B. failed to undertake efforts to report S.G.'s suspected substance abuse or mental health issues. M.B. faults S.G. for the lack of consistent communication, but does not refute that he was not regularly in touch with the children before their removal. Even crediting M.B.'s argument that S.G. was difficult to contact via telephone, it does not explain why he visited the children only once and never attempted to establish paternity while in Illinois so he could file a report

28

with CPS or obtain visitation with the children.  The finding is thus supported by substantial evidence.

M.B. asserts that, contrary to the court's view that it was "obligated to look at the bigger picture, a longer history," 2 RP (Aug. 5, 2022) at 194, of his relationship with the children, any consideration of his relationship with the children before DCYF's intervention was irrelevant to a dependency finding under RCW 13.34.030(6)(c).  M.B. does not provide legal authority for the argument that a court may not factor in a parent's relationship with the child prior to the child being removed when making an assessment under subsection (6)(c) of the statute or explain why he believes this to be the case.  *See Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) ("We will not consider an inadequately briefed argument.").

Even if we were to assume M.B.'s contact with his children before their removal from S.G.'s care was legally irrelevant, his efforts to communicate and establish a relationship with them following DCYF intervention was accounted for by the trial court.  In entering the order of dependency, the court found M.B. "has not been a part of a family unit and lacks a bond with the above named child."  CP at 183.  In its oral ruling, the court recognized that M.B. "sometimes has found it hard to have a video call with the children because he would fall asleep," and had seen the children in person only twice between 2016 through the time of the fact-finding hearing.  2 RP (Aug. 5, 2022) at 196.  Regardless, when the court found M.B. "has been very responsive since March," it was

considering the depth of M.B.'s current bond with the children as a potential mitigating

factor that weighed against dependency. 2 RP (Aug. 5, 2022) at 193. Accordingly, any

error was harmless.

III. SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING THAT M.B. AND A.T. LACKED A CONCRETE PLAN FOR CHILDCARE

M.B. avers that substantial evidence did not support a finding that he and A.T.

lacked a childcare plan, because many family members, neighbors, and friends testified

that they would be willing to assist with childcare on days when the couple's work

schedules overlapped. Br. of Appellant at 26-27. In its oral ruling, the court

acknowledged that while some people—including M.B.'s sister and neighbor—testified

they would be willing to assist with childcare, it was cognizant of the fact that any

childcare schedule would necessarily require the assistance of third parties and that M.B.

was sometimes exhausted after work. In its written order, the court added, "The court is

also not satisfied that there is a plan to address childcare for these children." CP at 183.

M.B.'s argument blurs the distinction between a concrete plan and an intent to

create a plan. The testimony shows that M.B. and A.T. had multiple potential providers,

but had failed to secure a specific provider. M.B. agrees there was no concrete plan, but

claims it was only due to the court having yet to place the children with him. M.B.'s

assertion runs contrary to the evidence. At the time of trial, both M.B. and A.T. knew

their work schedules. Since the couple was aware of their work schedules and already

had children in need of care during their work hours, no reason exists as to why they lacked a plan for childcare for the three additional children.

Courts may not punish parents for working full-time. *Schermer*, 161 Wn.2d at 944. But that is not what the court did here. Instead, the court held that M.B. and A.T. lacked a concrete plan, and further suggested that any plan would necessarily rely on a third party. Given the children's trauma and mistrust of adult authority figures, the potential introduction of a strange person into their daily routines was an appropriate factor to consider. With the children's history of suffering substantial trauma, introducing various care providers or relying on the older children to care for the younger children creates danger of substantial damage to the children's psychological and physical development. Similarly, M.B.'s long work hours and subsequent exhaustion following his shifts raises concerns that he would be unable to effectively parent the children and meet their high-demand emotional needs after he returned home in the evening hours.

## CONCLUSION

Individually, each basis cited by the trial court to support a finding of dependency may not constitute a danger of substantial damage to the children's psychological or physical development. However, in viewing these reasons collectively, especially in light

of the tremendous trauma the children have suffered, substantial evidence supports the

trial court's finding of dependency under RCW 13.34.030(6)(c).  Accordingly, we affirm.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Cooney, J.

I CONCUR:

_____
Staab, J.

No. 39186-8-III
(consolidated with Nos. 39187-6-III; 39188-4-III)

PENNELL, J. (dissenting) — I disagree with the majority's analysis because the facts presented at the dependency fact-finding hearing do not support a legal conclusion that M.B. is incapable of adequately caring for his children such that his children would be at risk of substantial damage to their psychological development in his care.[1] *See* RCW 13.34.030(6)(c). At most, the State's evidence invites speculation that M.B.'s home might be damaging to the three children. But speculation is not sufficient to justify interference with M.B.'s rights as the children's parent. The State has the burden of proving the need for a dependency. M.B. does not bear any burden of disproving the validity of the State's concerns. *Cf. Troxel v. Granville*, 530 U.S. 57, 69, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion) (faulting trial court for applying "exactly the opposite presumption" it should have, where trial court required children's mother to disprove grandparents' case for visitation). Because I conclude the State did not meet its burden, I would reverse the orders of dependency.

BACKGROUND

At the time of the dependency proceedings, M.B. lived in Illinois with his girlfriend. Several children also lived in the home, including two toddlers shared by

---

[1] There does not appear to be any claim that placement with M.B. would create a risk of damage to the children's physical development. *See* RCW 13.34.030(6)(c).

M.B. and his girlfriend as well as three older children from different relationships. M.B. worked full time and his girlfriend generally performed caretaking responsibilities, although she recently obtained work outside the home as a certified nursing assistant.

The relationship between M.B. and his girlfriend has been rocky. M.B.'s girlfriend has been treated for depression and/or bipolar disorder. *See* 1 Rep. of Proc. (RP) (Aug. 4, 2022) at 67-68. M.B. has also has been treated for depression. *See id.* Conflict in their home led the couple to call on police for assistance four times from June 2019 to December 2021. No neighbors or third parties ever called the police on the couple. And after each instance of police intervention, no arrests were made, nor did police ever make any referrals to child protective services. Although the allegations between M.B. and his girlfriend sometimes included accusations of physical interactions, there was never an allegation of any conduct that could be classified as a felony. While the trial court expressed skepticism about M.B.'s girlfriend's credibility on the basis of inconsistent out-of-court statements, the girlfriend testified plausibly during the fact-finding hearing that the volatility between herself and M.B. was attributable to her prior failure to take needed mental health medications. *See id.* at 95-96.

In addition to the children already living with him in Illinois, M.B. is the father of the three children who are the subject of the dependency orders on consolidated review. M.B. and the children's mother broke up in 2016. Since that time, M.B.'s contact with the three children has been extremely limited. The children's mother never identified

M.B. as the father on the children's birth certificates, and her inconsistent access to a working phone apparently complicated M.B.'s efforts to speak with the children. But M.B. never denied parentage or responsibility for the children. After the Department of Children, Youth, and Families removed the children from the mother's home in 2022, M.B. reengaged contact with the three children and established paternity. The children have responded well to M.B.'s efforts. They have all expressed a desire to have a relationship with their father and "all said they want to live with their father." *Id*. at 74.

After the three children were taken from their mother's home, the Department began investigating the possibility of placing them with M.B. It learned that M.B. had a stable job and housing. Records checks revealed he had never been arrested in his home state and had never been the subject of any calls to child protective services. *See id*. at 75.

Although the Department initially appeared receptive to placing the children with M.B., things changed once it learned about the four police calls made by M.B. and his girlfriend. According to a Department social worker, once she received copies of the police reports, she decided the Department needed "more information" about M.B. and his girlfriend. *Id.* at 81. According to the social worker, she could gain more information by having M.B. and his girlfriend participate in "services and a home study." *Id.* at 75. Because of the red flags raised by the police reports, the social worker did not engage in collateral contacts with M.B.'s friends and family in Illinois. Instead, the dependency

petitions were amended to allege that M.B., in addition to the mother, was unable to provide a safe home for his children.

At the time of the dependency fact-finding hearing, the only service that had been provided to M.B. and his girlfriend was couple's therapy. This proved unproductive. At some point, M.B.'s girlfriend sent the therapist text messages accusing M.B. of being "mean" and "mentally abusive." Clerk's Papers (CP) at 134. M.B. and his girlfriend stopped therapy without any resolution. M.B.'s girlfriend later testified that her allegations against M.B. in the text messages were the product of her being off her medications. *See* 1 RP (Aug. 4, 2022) at 96, 100. Although the Department's social worker had talked about performing a home study of M.B.'s residence, no study had been arranged or completed by the time of the dependency fact-finding hearing. *See* CP at 284.

During the dependency hearing, the State called as witnesses the Department's two social workers, a court-appointed special advocate (CASA), and law enforcement officers from Illinois. M.B. and his girlfriend both testified, as did M.B.'s sister and one of his friends. At the close of testimony, the CASA testified that while she had originally recommended a dependency in her written report, the evidence presented at the hearing led her to change her mind. She was impressed by M.B.'s commitment to his children and believed placement in M.B.'s home would not pose a safety threat to the children. The CASA testified that the children had expressed "on numerous occasions that they would like to live with their father." 2 RP (Aug. 5, 2022) at 178.

4

The Department did not share the CASA's optimism. Despite the lack of any visits to M.B.'s home or consultation with his family or other references, one of the social workers testified she was concerned about conflict in M.B.'s home due to the instability of the relationship between M.B. and his girlfriend. The social worker opined the three children who were the subject of the dependency actions were emotionally vulnerable due to having been removed from their mother's care by law enforcement. *See* 1 RP (Aug. 4, 2022) at 68. According to the social worker, the purported chaos in M.B.'s home made it "possible" the three children could suffer harms such as "elevated depression, insecurity, and behavior problems" and "[w]orst case scenario . . . serious injury or death" if placed in M.B.'s custody. *Id.* at 68, 70.

In summarizing its case for dependency, the State framed its stance against M.B. as follows: "Parents arguing with one another from time to time, occasionally with police involvement. How is a child supposed to be able to feel stable in that environment?" 2 RP (Aug. 5, 2022) at 183-84. "[C]hildren who deal with this type of conflict are at risk of developing anxiety disorders and depression and children who develop these issues can be at risk of being unable to form bonds, have difficulty with school and can later turn to substance use to cope with these symptoms." *Id.* at 184. "This is certainly not a case where the Department is arguing that reunification is far off or cannot be achieved. However, until the Department can be reasonably assured that [M.B.]'s relationship is reasonably

5

stable it cannot recommend placement with this family, especially of these vulnerable children." *Id.*

The trial court shared the State's concern that an immediate transfer to M.B.'s home would place the children at risk. Quoting *In re Dependency of Schermer*, 161 Wn.2d 927, 951, 169 P.3d 452 (2007), the trial court reasoned that it need not "'stay its hand until actual damage to the endangered child has resulted.'" 2 RP (Aug. 5, 2022) at 190. The court focused on the fact that the children had never been a part of M.B.'s home life, so there was no trauma from the act of forced separation to avoid in that sense. *Id.* at 191-92. The court recognized its decision was a "close" call, but it ultimately reasoned it could not "in good conscience send these children today across the country with so many unresolved issues in the father's household." *Id.* at 192. The court explained it was "principally" concerned with psychological harm to the children that could be caused by moving into M.B.'s house. *Id.* at 198. The court acknowledged the children had already been through "psychological and emotional" trauma in being removed from their mother's home and it wanted to "make sure it doesn't get repeated." *Id.* In its written orders, the court explained that "it is not in [the children's] best interest[s] to be placed in a household with ongoing conflict issues." CP at 255. Because M.B. did not have a "real plan" to deal with future conflict or a firm childcare plan, the court concluded "placement of the [children] with [M.B.] would currently result in circumstances which would

6

constitute a danger of substantial damage to the [children's] psychological or physical development." *Id.*

M.B. has appealed the orders of dependency. Although the Department originally claimed reunification between M.B. and his children was not far off, this case is not moot. The dependency remains pending over a year later.

ANALYSIS

The State's power to keep children from their parents is limited to exceptional circumstances. A child may be declared dependent on the State in cases of abandonment, abuse or neglect, long term foster care, or when the child "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(c). The dependency process is not intended to be permanent; the State must make reasonable efforts to facilitate parent-child reunification. *See* RCW 13.34.180(1)(d). Nevertheless, even a temporary dependency is an incredibly intrusive governmental interference with private affairs and thus demands strict judicial scrutiny. *See In re Custody of Z.C.*, 191 Wn. App. 674, 691-93, 366 P.3d 439 (2015); *see also In re Dependency of A.C.*, 1 Wn.3d 186, 191, 195-96, 525 P.3d 177 (2023) (noting that "dependency . . . must be approached with due solemnity" because it "implicates fundamental rights").

In a dependency action, the State bears the burden of proving its case by a preponderance of the evidence. RCW 13.34.130. This is a less onerous standard than what applies when the State seeks to permanently terminate parental rights. *See* RCW 13.34.190(1)(a)(i) (requiring the State to prove its case for termination by "clear, cogent, and convincing evidence"). Nevertheless, it is no meager burden. It is the same burden that most civil plaintiffs must satisfy to establish liability. *See Est. of Salkup v. Vancouver Clinic, Inc.*, 145 Wn. App. 572, 591, 187 P.3d 291 (2008). The applicable burden requires the State to prove that the elements of its case are more likely than not satisfied. *See Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005) (plurality opinion). The State may not satisfy its burden through speculation, because speculation is not evidence. *Sommer v. Dep't of Soc. & Health Servs.*, 104 Wn. App. 160, 172, 15 P.3d 664 (2001) ("A verdict cannot be founded on mere theory or speculation."); *see also Fergen v. Sestero*, 174 Wn. App. 393, 397, 298 P.3d 782 (2013) (noting that, for a party's case theory to be submitted to a fact finder, the party's evidence "'must rise above speculation and conjecture'" (quoting *Bd. of Regents of Univ. of Wash. v. Frederick & Nelson*, 90 Wn.2d 82, 86, 579 P.2d 346 (1978))).

The State's primary allegation in this case is that the conflict between M.B. and his girlfriend creates a home environment that could be detrimental to the psychological well-being of M.B.'s three children that are subject to the dependency actions. This concern, while legitimate, is not a sufficient basis for a dependency. The dependency

8

statute "does not permit a dependency based on danger of damage to a child's psyche . . . but danger of damage to the development of the child." *In re Dependency of Q.S.*, 22 Wn. App. 2d 586, 609, 515 P.3d 978 (2022). Furthermore, the Department social worker's hypothesis that chaos in M.B.'s home could "possibl[y]" harm his children, 1 RP (Aug. 4, 2022) at 70, amounts to speculation. And speculation is not sufficient to interfere with a parent's rights. *See In re Dependency of M.S.D.*, 144 Wn. App. 468, 478, 182 P.3d 978 (2008) (noting orders of dependency must be supported by "substantial evidence"); *see also Grimwood v. Univ. of Puget Sound*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988) (noting that conclusory suppositions are not evidence), *abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 404 P.3d 464 (2017).

This is not a case like *Schermer*, where the threat of future harm was sufficiently probable to support a dependency. *See* 161 Wn.2d at 951-52. In *Schermer*, there was specific evidence that the child would pose a danger to himself and others absent State intervention, given that the child had repeatedly threatened to kill himself and his family. *See id.* at 952. In contrast, here, the State merely established that conflict in M.B.'s home *might* be emotionally upsetting to the three children based on a series of unknown circumstances, including the severity of the conflict and how the children might react.

Nor is this a case where findings of domestic violence in M.B.'s household established an appreciable risk to the children's psychological development. In *Rodriguez*

9

*v. Zavala*, 188 Wn.2d 586, 596-97, 398 P.3d 1071 (2017), the Supreme Court recognized that children can be victimized by domestic violence by "witnessing one parent assault the other" or by "hearing and seeing [the] effects [of domestic violence] on loved ones." But here, the trial court made no findings that domestic violence had occurred. *See* CP at 255 (finding that "household conflict"—but not domestic violence—had occurred). Nor is there any evidence that the children already living in M.B.'s home have been harmed by any exposure to domestic violence, let alone so harmed that they face a risk of substantial developmental damage. Given there is no evidence that the children already living in M.B.'s home have been harmed by an exposure to domestic violence, there is no basis to conclude that the children at issue here would be harmed living in the same home. Insofar as the trial court faulted M.B.'s home for having a nonzero chance of "household conflict," *id*., this was error. *See In re Welfare of A.W.*, 182 Wn.2d 689, 702, 344 P.3d 1186 (2015) (noting parents are not obliged to prove they are "model parents" to retain a "fundamental liberty interest" in raising their children free of governmental interference).

The trial court and the majority fault M.B. for having insufficient plans to address instability in his relationship with his girlfriend. A parent's failure to sufficiently alleviate the State's concerns can be a basis for a dependency finding where documented problems in the parent's home have already necessitated the removal of children. *See, e.g.*, *In re Dependency of Brown*, 149 Wn.2d 836, 841-42, 72 P.3d 757 (2003) (per curiam)

(affirming order of dependency where, although father had made progress "toward alleviating the problems that led to [his child]'s removal from his care, he had yet to show he could provide a stable home"). But here, there is no specific evidence showing M.B. has ever been unable to provide a safe home to any children in his care. Without such evidence, there is no basis for requiring M.B. to prove stability or parental fitness. The burden of proof lies with the State, not M.B.

The trial court's remaining reasons for its orders of dependency were that M.B. lacked a strong bond with his children and did not have sufficiently concrete childcare plans. Plainly, neither of these circumstances demonstrate that M.B. is "[in]capable of adequately caring" for his children. RCW 13.34.030(6)(c). Nor does the trial court's citation of these reasons satisfy constitutional demands. It may be in the best interests of these children to be placed in a home where they have a strong, preexisting emotional bond with their caretaker and access to a structured childcare routine. "But it is well settled that 'best interest of the child' is a constitutionally insufficient basis on which to deprive a parent of parental rights." *Z.C.*, 191 Wn. App. at 692 (quoting *In re Custody of Smith*, 137 Wn.2d 1, 20, 969 P.2d 21 (1998)). "The fundamental liberty interest of natural parents in the care, custody, and management of their child[ren] does not evaporate simply because they have not been model parents." *In re Dependency of Ca.R.*, 191 Wn. App. 601, 624, 365 P.3d 186 (2015). M.B.'s lack of a strong bond with his children and the imprecision of his childcare plans are simply not circumstances that can warrant

11

interference with his rights as the children's parent.[2]

The majority appears to reason that, individually, each of the trial court's bases for its decision may have been insufficient. Nevertheless, viewed collectively, the trial court's reasons provided a proper justification. *See* majority at 31-32. But this is not a case where a combination of familial circumstances can justify a dependency, even where each individual factor might be insufficient. *Cf. Schermer*, 161 Wn.2d at 945-46, 952-53 (clarifying that parents' incapability of providing adequate care was "not only" because of their "economic circumstances," but that the family's financial situation supported a dependency in the context of the child's severe behavioral disability and the family's emotional trauma in contending with the child's alarming threats). The fact that M.B. has lacked a strong bond with his children does not mean he will be unable to arrange for their childcare. Nor does it enhance the impact of his conflict with his girlfriend. Conversely, the lack of a concrete childcare plan does not lessen M.B.'s bond with his children. Nor does it say anything about whether the children will be harmed by the relationship between M.B. and his girlfriend. Where none of the trial court's reasons

---

[2] The State argues the lack of a bond between M.B. and his children contributed to the children being harmed in their mother's care. According to the State, had M.B. been more connected with his children, he would have taken steps to protect them from their mother. Even assuming M.B. should be expected to know how to initiate proceedings to transfer custody, the State's reasoning is faulty. The fact that M.B. did not previously take steps to remove the children from their mother's care does not mean that he is now incapable of providing a safe household for the children.

established the children would be in appreciable danger in M.B.'s care, simply adding those reasons together does not make any one of them more substantial.

Here, too much was unknown to justify interference with M.B.'s parental rights. No witness ever testified that the children would be endangered by placement in M.B.'s care. No witness testified that the children had special needs that required expertise beyond M.B.'s abilities. No one testified that M.B. would be unable to procure adequate childcare or transportation. The testimony against M.B. was entirely speculative. As the social worker admitted, she stopped investigating M.B. as a possible placement once she learned of police contacts because she wanted to learn more. *See* 1 RP (Aug. 4, 2022) at 75. The apparent plan was to utilize the dependency process to acquire information. Similarly, the Department's position was that it should be able to interfere with M.B.'s custodial rights until it could be "reasonably assured" that he could provide a stable home. 2 RP (Aug. 5, 2022) at 184. These concerns may be understandable, but a dependency is not an investigative tool. Rather, a dependency requires concrete proof that a parent actually poses a danger of substantial damage to their child's development.

The State is not entitled to keep a parent from their children—even temporarily— simply because the parent purportedly has a chaotic home life and the children seem better off elsewhere. I would reverse the orders of dependency.

_____
Pennell, J.

13